[No. G031073. Fourth Dist., Div. Three. Sept. 13, 2002.]

JOSEPH A. JEFFREY, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
HUNTINGTON BEACH CITY COUNCIL et al., Real Parties in Interest.

**COUNSEL**

Bruce Peotter for Petitioner.

No appearance for Respondent.

Gail C. Hutton, City Attorney, Scott F. Field, Assistant City Attorney; Strumwasser & Woocher, Frederic D. Woocher, Michael J. Strumwasser, Kevin S. Reed and Lea Rappaport Geller for Real Parties in Interest.

**OPINION**

**SILLS, P. J.—**

I

Beginning in May 2002, a group of Huntington Beach residents began circulating petitions supporting a proposed initiative which would amend the city's charter to change the city council from seven members elected by the city at large to five members elected from separate districts. The initiative will, if passed, also put absolute lifetime term limits on each council member: Council members could have no more than two terms in a lifetime. Present council members cannot serve more than two consecutive terms. The supporters call their initiative the "Fair Apportionment and Individual Representation" charter initiative, or "FAIR."

The changes proposed by the FAIR initiative would be effective with the November 2004 general municipal election. By mid-June, the proponents of the initiative had turned over 22,000 signatures to the city clerk. There is no question the supporters had obtained enough signatures to put the FAIR initiative on the ballot.

The question is, which ballot—this year's or one in 2004? The current Huntington Beach City Council has not attempted to conceal its opposition to the initiative, and has decided not to put the initiative on the ballot for the upcoming November election. Rather, the council has put the initiative on the March *2004* ballot. The council makes no bones about its motive: It wants time to defeat the initiative, either in court or by mounting its own campaign against it.

Understandably, the supporters of the initiative promptly filed a petition in the superior court asking it to order the initiative placed on this November's ballot. The trial judge concluded that the council had the legal authority to delay the election on the initiative until March 2004, and the supporters have now filed a petition in this court seeking to overturn the trial court's decision.

## II

Let's begin at the beginning, which is Elections Code section 9255.[1] The statute allows amendments or repeals of a city charter to be "proposed by a petition signed by 15 percent of the registered voters of the city."[2] The key language is in subdivision (a), which spells out one of *three* possibilities for submitting such a proposal to the voters. Note that it enumerates minimum time limits, but no maximum time limits: "The following city or city and county charter proposals shall be submitted to the voters at *either a special election* called for that purpose, *at any established municipal election date*, or at *any established election date pursuant to Section 1000*, provided that there are at least 88 days before the election." (Italics added.)

Section 9255 was added to the Elections Code in 1994, but there is a newer statute, section 1415, enacted in 1996, which contains substantially the same provisions as subdivision (a) of section 9255. Like section 9255, it sets forth three choices with minimum time limits but no maximum time limits: "City or city and county charter proposals that qualify pursuant to Section 9255 shall be submitted to the voters *at either the next regular general municipal election* occurring not less than 88 days after the date of the order of election, or *at a special election called for that purpose* or *on any established election date pursuant to Section 1000* occurring not less than 88 days after the date of the order of election." (Italics added.)

█ We are immediately confronted with a mootness problem based on the 88-day minimum time frames spelled out in both section 9255 subdivision (a) and section 1415. As we write in September 2002, it is less than 60 days until the November 5, 2002 election. Would it even be possible for this court to give the petitioner the relief he asks for?

Assuming that it were *physically* possible for the city clerk to prepare ballots for the November 2002 election (and the city has not presented evidence in this writ proceeding that even at this late date that would be impossible to do), the answer is yes. The language at the end of section 1415 makes it clear that the 88 days are dated from the "order of election." It is the relevant legislative body, here the city council, and not the court, which "orders" municipal elections when voters submit initiatives. (See § 9214 [giving "legislative body" specific choices when presented by an initiative

---

[1] All statutory references in this opinion will be to the Elections Code, unless otherwise specifically designated.

[2] The first four subdivisions of section 9255 are essentially a list of permutations of ways a city or county charter may be repealed or amended (e.g., by charter commission, by the legislative body, by petition signed by 15 percent of the registered voters). Voter initiative is mentioned in subdivision (3).

petition has been signed by not less than 15 percent of the city's voters, including immediately ordering a special election, or ordering a report and then ordering a special election]; *Moore v. City Council* (1966) 244 Cal.App.2d 892, 902 [53 Cal.Rptr. 603] [requiring city council to order a recall election in wake of recall petitions]; *Baroldi v. Denni* (1961) 197 Cal.App.2d 472, 477 [17 Cal.Rptr. 647] [after city clerk examined petitions and filed them with city council, council had "ministerial duty" to "order at once" special election within specified time frame].)

In the case before us, the city council made its "order of election" on August 5, 2002, which was some 93 days before the November 2002 election. It thus had the power, consistent with the 88-day time frames of sections 9255, subdivision (a) and 1415, to have set the FAIR initiative on the November 2002 ballot. Its supporters having gotten their initiative to the city clerk and council in time for the council to make an "order of election" consistent with the 88-day deadline, that should be enough to prevent mootness by operation of the two statutes. Any other result would be nonsensical, for two reasons.

One, it would invest city councils with *absolute* veto power in cases where they wanted to keep an initiative off the ballot in an upcoming election. All they would have to do is simply *delay* making any order of election until the 88-day deadline had passed (or until the 88-day deadline was so close that no court challenge could be mounted in time). City councils could then insulate themselves from any challenge to a decision *not* to put an initiative on the ballot in the next election.

Two, such a reading contravenes the evident purpose of the two statutes, which is to authorize procedures *allowing* initiative measures to be on the ballot. If the Legislature wanted to give city councils veto power over initiatives to repeal or amend city charters, why not just say that if a city council doesn't like an initiative, it can just reject it and leave it at that? The statutes should obviously be construed to avoid such a reductio ad absurdum.

While the city has indicated that putting the FAIR initiative on the ballot at this late date might be difficult, particularly in light of the petitioner's failure to name the county registrar of voters in this action, it has not argued that it would be physically impossible.[3] We will therefore consider the merits of the case and not deny the petition as moot.

---

[3]Because we will reluctantly decide for the city on the merits, we need not reach the issue of whether the failure to name the county registrar as a defendant bars relief. For that reason, and also because the city has not made a physical impossibility argument, we deny as irrelevant petitioner's request for judicial notice of the city's petition for rehearing in

## III

■ As noted above, the two statutes governing initiatives to repeal or amend city charters have no maximum time limits. Nothing in them requires a city council to "order" the election at the *next* available opportunity. Indeed, the very fact that each statute allows *options* in election dates refutes that idea.[4]

Significantly the Legislature knew how to require an initiative be placed on the ballot in the very next election if it had wanted to. Section 1405 governs local initiatives that do not involve *charter* repeals or amendments. It *does* institute maximum time limits on the required election. The first sentence of subdivision (a) of section 1405 provides: "Except as provided below, the election for a county, municipal, or district initiative that qualifies pursuant to Section 9116, 9214, or 9310 [all of which deal with noncharter initiatives] shall be held not less than 88 *nor more than 103 days* after the date of the order of election." (Italics added.)

The presence of maximum time provisions for noncharter elections but not charter elections suggests that the lack of outside time limits might not have been an oversight. In fact, section 9214, which is one of the noncharter provisions cited in section 1405 (it involves ordinances, not charters) has a provision for the initiative itself to "contain[] a request that the ordinance be submitted immediately to a vote of the people at a special election." If it does, section 9214 then requires the local legislative body to either (a) "[a]dopt the ordinance . . . within 10 days after it is presented" or (b) "[i]mmediately order a special election . . ." Once again, all the signs point to the inescapable conclusion that the Legislature did not intend to force city councils to put initiatives to repeal or amend city charters on the ballot in the very next election.

The proponents of the FAIR initiative would appear to recognize that inconvenient fact. Their argument is not built (because it couldn't be built)

---

*Huntington Beach City Council v. Superior Court* (2002) 94 Cal.App.4th 1417 [115 Cal.Rptr.2d 439], where the city asked for changes in ballot language for an upcoming election where the time frames were even shorter than the case before us and where the county registrar also had not been named as a party.

[4]There is a subtle difference between section 9255, subdivision (a), which lists, as among the options, "any established municipal election date" and section 1415, which lists, as among its options, "the next regular general municipal election." We do not opine on which of the two statutes might be controlling in the event that the slight differences between them were to become material; in the case before us, any difference in the two statutes is immaterial.

on the operation of sections 9255 and 1415. Rather, they argue that Government Code section 36502, enacted in 1994, required the Huntington Beach City Council to put the FAIR initiative on the ballot in November 2002.[5]

Government Code section 36502 consists of two subdivisions. Subdivision (a) is irrelevant because it deals with residency requirements for city office. Subdivision (b) is relevant, because it places special requirements on elections for term-limits initiatives, and FAIR's proponents are certainly right in claiming that theirs is a term-limits initiative. Here is the statute in its entirety:

"(b) Notwithstanding any other provision of law, the city council of a general law or charter city may adopt or the residents of the city may propose, by initiative, a proposal to limit or repeal a limit on the number of terms a member of the city council may serve on the city council, or the number of terms an elected mayor may serve. Any proposal to limit the number of terms a member of the city council may serve on the city council, or the number of terms an elected mayor may serve, *shall apply prospectively only and shall not become operative unless it is submitted to the electors of the city at a regularly scheduled election and a majority of the votes cast on the question favor the adoption of the proposal.* Notwithstanding the provisions of this subdivision, the provisions of any city charter that, on January 1, 1996, impose limitations on the number of terms a member of the city council may serve on the city council, or the number of terms an elected mayor may serve, shall remain in effect. Unless otherwise prohibited by a city charter, any city charter may be amended pursuant to this section or pursuant to the procedures specified in the charter, to include the limitation authorized in this subdivision." (Italics added.)

The proponents of the initiative here point to the italicized words in the middle of Government Code section 36502, and posit this syllogism: According to section 700 of the Huntington Beach City Charter "[g]eneral municipal elections" are held in Novembers in even-numbered years. "All other municipal elections," according to section 701 of the charter, "shall be known as special municipal elections." Accordingly, when the Huntington Beach City Council placed the initiative on the March 2004 ballot, it was placing the initiative on the ballot for a "special," as distinct from "general," municipal election. However, because the initiative is (among other things) a

---

[5]Because we will ultimately conclude that the city acted in conformity with Government Code section 36502, we will not deal in this opinion with whether the statute, as petitioner would apply it, might be unconstitutional as somehow impinging the home rule authority of charter cities, a counterargument made by the city here, relying on *Cawdrey v. City of Redondo Beach* (1993) 15 Cal.App.4th 1212 [19 Cal.Rptr.2d 179].

term-limits measure, according to Government Code section 36502, it cannot be adopted at a "special" election, it can only be adopted at a "regularly scheduled election." Because the initiative by its terms would become effective with the "2004 general municipal election," which is in November, it absolutely has to be on the ballot prior to then, and the only general *municipal* election that meets the requirement is the November 2002 election.

Preliminarily, we must note that the statute does not say that a term-limits initiative "shall not become operative unless it is submitted to the electors of the city at a regularly scheduled *municipal* election." The word "municipal" must be inserted into it, which is the flaw in the proponents' argument. Judges are instructed by section 1858 of the Code of Civil Procedure that they are not to "insert what has been omitted, or to omit what has been inserted." We therefore do not have the power to rewrite Government Code section 36502 to make it read the way the FAIR proponents want it to.

Nor is there any basis for implying the word "municipal" into Government Code section 36502. The most natural construction of the words "regularly scheduled election" would be *any* regularly scheduled election. The fact that the statute purports to address "a general law or charter city" while at the same time using the phrase "a regularly scheduled election" indicates, if anything, that any "regularly scheduled" election would do. Once again, we are confronted with the annoying fact that the Legislature clearly knew how to write the statute to say what the petitioner says it says, and it didn't.

Further, there is good reason to conclude that the Legislature actually wanted to do what it did. If initiatives proposing term limits are being subjected to a special hurdle—namely that they cannot take effect at a "special" election, but a "regularly scheduled" one—the natural inference is that the purpose of Government Code section 36502 is to make sure that term limits are voted on in general elections with their traditionally larger turnouts, not done in a corner in the middle of January in an odd-numbered year. The obvious import of Government Code section 36502 is that a local term-limits initiative should not be sneaked through the electorate by scheduling it in a special municipal election where the turnout percentage is unlikely to reach double digits.

The controlling issue in this case thus devolves to this very specific question: Is the March 2004 ballot a "regularly scheduled election"? It is not enough here to say that section 1000 makes it an "established" election date. (See § 1000, subd. (d) ["The first Tuesday after the first Monday in June of each odd-numbered year."].) That language merely suggests availability as

distinct from regularity. We care about whether it is "regularly scheduled," not "established." And for those of us who can remember when presidential primaries in California were held in June, not March (and the races for presidential nominations weren't over by "SuperTuesday"), it seems counterintuitive to describe the March 2004 election as a "regularly scheduled" one.

But the March 2004 election *is* a "regularly scheduled" one. The regularly scheduled primary election that used to be held in June is now being held in March. Section 1001 provides that "Elections held in March and November of each even-numbered year are statewide elections and these dates are statewide election dates." California's delegates to the Democratic and Republican national conventions will be selected in the election of March 2004.[6]

So the Huntington Beach City Council *has* indeed scheduled the initiative for a vote of the voters at an election in compliance with Government Code section 36502. The city council set the election on the FAIR initiative at a date allowed by law. There is, of course, this cold comfort for the initiative's proponents: Whatever other legal challenges the initiative may face (the city council has already argued to the trial court that it violates the single-subject rule) it will *not* have to face the argument, if it passes, that it was passed at an election not allowed by Government Code section 36502.

## IV

What about the problem that neither section 9255 nor 1415 has any ostensible outside time limits at all? If both statutes are complied with merely by scheduling an election at "any established election date pursuant to Section 1000," that could mean indefinite postponement. As we write in 2002, the first Tuesday after the first Monday in November 2012 is also an "established election date pursuant to Section 1000" and therefore theoretically available. The proponents of the FAIR initiative raise the specter of a de facto veto by a hostile city council using its power to manipulate when an initiative to amend or repeal a city charter can appear on the ballot.

On reflection, the specter is illusory, as long as the legislative body that "orders" the election respects the effective date by which a charter initiative

---

[6]As we write, the Legislature is apparently considering scheduling March 2004 as the presidential primary election, with June 2004 for everything else. Alas what havoc New Hampshire and "SuperTuesday" have played with the scheduling of the traditional June California primary election! We can only recommend that if the Legislature is going to fiddle around with election dates, it might want to consider the problem, which we tackle in the next part of this opinion, created by the fact that sections 9255 and 1415 have no maximum time limit.

becomes effective. That is, as long as the legislative body chooses a date not inconsistent with an initiative's effective date, there is no risk of a de facto veto by a hostile city council. (Of course, by the same token, supporters of initiatives must present them so that they can be passed well before their effective dates, but that is only more obvious common sense.)

Here, for example, the proposed amendment is to take effect, if passed, with the November 2004 election. It therefore couldn't possibly take effect simultaneously with the November 2002 election, because the amendment involves the election of the city council itself. No one knows yet whether the initiative will pass and the city be divided into five districts, but one thing is certain: The proponents of the initiative were too late to have their proposal implemented *in* the upcoming November 2002 election.

Given its November 2004 effective date, the simple constraints of chronology dictate that the initiative be voted on prior to November 2004. That is perfectly doable because, under Elections Code section 1001, there are at least two regularly scheduled elections in each even-numbered year. Here, the city council selected the only date *other than* November 2002 which might have satisfied the internal terms of the initiative and Government Code section 36502.

V

Finally, there is a problem which has not been briefed in this writ proceeding—we need only identify it because it is inherent in these facts: If the Legislature has given local city governments the power to select among dates for a charter election, does the local government have absolutely unfettered discretion to pick among those dates, or is its selection reviewable by the courts for abuse of discretion? It is a question that arises because here the city council has openly admitted that it used its power to select a later date as a means of gaining time to defeat the measure.

The issue has not been presented by the briefs filed with this court, and therefore must await another case. However, it is worth remarking that the Legislature may want to take a look at the whole matter of the scheduling of initiatives to repeal or amend city charters. One senses in the core facts of this case the problem that the supporters of the FAIR initiative may have been misled by confusing and counterintuitive election laws. After all, why *shouldn't* charter initiatives be scheduled at the next major election if their supporters do what is necessary to meet the 88-day deadline? Allowing city councils to select an election further away gives city councils extra time to thwart initiative efforts of the citizens. We thus come to our decision

reluctantly, required to do so by the Legislature's drafting, which, as it has written the law, gives city councils the limited authority to do just that.

The requested writ petition is denied.

Given the puzzling nature of the statutes involved, in the interests of justice each side will bear its own costs.

Rylaarsdam, J., and O'Leary, J., concurred.