Filed 8/2/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CATHERINE A. BOLING et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | S242034 |
| v. | ) | |
| | ) | Ct.App. 4/1 D069626 |
| PUBLIC EMPLOYMENT RELATIONS BOARD, | ) | |
| | ) | PERB Dec. No. 2464-M |
| | ) | |
| Respondent; | ) | |
| | ) | |
| | ) | |
| CITY OF SAN DIEGO et al., | ) | |
| | ) | |
| Real Parties in Interest. | ) | |
| _____) | | |
| CITY OF SAN DIEGO, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | Ct.App. 4/1 D069630 |
| PUBLIC EMPLOYMENT RELATIONS BOARD, | ) | |
| | ) | PERB Dec. No. 2464-M |
| | ) | |
| Respondent; | ) | |
| | ) | |
| | ) | |
| SAN DIEGO MUNICIPAL EMPLOYEES ASSOCIATION et al., | ) | |
| | ) | |
| Real Parties in Interest. | ) | |
| _____) | | |

1

This case arises from unfair practice claims filed by unions after San Diego's mayor sponsored a citizens' initiative to eliminate pensions for new municipal employees and rebuffed union demands to meet and confer over the measure. The Court of Appeal annulled a finding by respondent, the Public Employment Relations Board (PERB), that the failure to meet and confer constituted an unfair labor practice. We granted review to settle two questions: (1) When a final decision by PERB under the Meyers-Milias-Brown Act (the MMBA; Gov. Code, § 3500 et seq.)[1] is appealed, what standards of review apply to PERB's legal interpretations and findings of fact?; (2) When a public agency itself does not propose a policy change affecting the terms and conditions of employment, but its designated bargaining agent lends official support to a citizens' initiative to create such a change, is the agency obligated to meet and confer with employee representatives?

These questions are resolved by settled law and the relevant statutory language. First, we have long held that PERB's *legal findings* are entitled to deferential review. They will not be set aside unless clearly erroneous, though the courts as always retain ultimate authority over questions of statutory interpretation. The MMBA specifies that PERB's *factual findings* are "conclusive" "if supported by substantial evidence." (§ 3509.5, subd. (b).) Second, the duty to meet and confer is a central feature of the MMBA. Governing bodies "or other representatives as may be properly designated" are required to engage with unions on matters within the scope of representation "prior to arriving at a determination of policy or course of action." (§ 3505.) This broad formulation encompasses more than formal actions taken by the governing body itself. Under the circumstances here, the MMBA applies to the mayor's official

_____

[1] Further undesignated statutory references are to the Government Code.

pursuit of pension reform as a matter of policy.[2]  The Court of Appeal erred, first by reviewing PERB's interpretation of the governing statutes de novo, and second by taking an unduly constricted view of the duty to meet and confer.

## I.  BACKGROUND

In November 2010, two San Diego city officials proposed public employee pension reforms.  First, Councilmember Carl DeMaio recommended that defined benefit pensions be replaced with 401(k)-style plans for all newly hired city employees.  Then, Mayor Jerry Sanders declared that he would develop a citizens' initiative to eliminate traditional pensions for new hires, except in the police and fire departments, and replace them with a 401(k)-style plan.  San Diego's charter establishes a "strong mayor" form of government, under which Sanders acted as the city's chief executive officer.  His responsibilities included recommending measures and ordinances to the city council, conducting collective bargaining with city employee unions, and complying with the MMBA's meet-and-confer requirements.

As relevant here, proposals to amend a city's charter can be submitted to voters in two ways.  First, a charter amendment can be proposed by the city's governing body on its own motion.  (Elec. Code, § 9255, former subd. (a)(2).)  Second, an amendment can be proposed in an initiative petition signed by 15 percent of the city's registered voters or, for amendments to a combined city and county charter, by 10 percent of registered city and county voters.  (Elec. Code, § 9255, former subd. (a)(3)-(4).)

In 2006 and 2008, Sanders had pursued two ballot measures affecting employee pensions.  These measures were intended to be presented to voters as the

_____

[2]  We are not called upon to decide, and express no opinion on, the merits of pension reform or any particular pension reform policy.

3

city's proposals. (See Elec. Code, § 9255, former subd. (a)(2).) In the course of developing them, Sanders met and conferred with union representatives, as required by *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 601. The 2006 proposal was approved by the voters. In 2008, the proposal never went to the voters because Sanders and the unions reached an agreement. In 2010, however, Sanders chose to pursue further pension reform through a citizens' initiative instead of a measure proposed by the city. He reached this decision after consulting with staff and concluding that the city council was unlikely to put his proposal on the ballot. He was also concerned that compromises might result from the meet-and-confer process. In a local magazine interview, he explained that "when you go out and signature gather . . . it costs a tremendous amount of money, it takes a tremendous amount of time and effort . . . . But you do that so that you get the ballot initiative on that you actually want. [A]nd that's what we did. Otherwise, we'd have gone through the meet and confer and you don't know what's going to go on at that point."

Sanders held a press conference at city hall to announce his plans. The event was attended by City Attorney Jan Goldsmith, City Councilmember Kevin Faulconer, and City Chief Operating Officer Jay Goldstone. A statement informed the public that "San Diego voters will soon be seeing signature-gatherers for a ballot measure that would end guaranteed pensions for new [c]ity employees." A photograph showed Sanders making the announcement in front of the city seal. The mayor's office issued a news release that explained the decision and bore his title and the city seal.[3] Faulconer disseminated the press release by e-mail, stating

---

[3] The release stated in part: "As part of his aggressive agenda to streamline city operations, increase accountability and reduce pension costs, Mayor Jerry Sanders today outlined his strategy for eliminating the city's $73 million structural deficit by the time he leaves office in 2012.

4

that he and Sanders "would craft a groundbreaking [pension] reform ballot measure and lead the signature-gathering effort to place the measure before voters." Sanders sent a similar e-mail declaring that he would work with Faulconer to "craft language and gather signatures" for a ballot initiative to reform public pensions.

---

"The mayor also announced he will place an initiative on the ballot that would eliminate defined benefit pensions for new hires, instead offering them a 401(K)-style, defined contribution plan similar to those in the private sector.

"The bold move is part of a major re-thinking of city government Sanders said must occur if San Diego is to provide citizens adequate services, end its structural deficit and be financially sound for future generations.

" 'Eliminating traditional pensions is a radical idea in municipal government, but we must acknowledge that we cannot sustain the current defined-benefit system, which was designed in another era for completely different circumstances,' Sanders said. 'Public employees are now paid salaries comparable to those in the private sector, and there's simply no reason they should enjoy a far richer retirement benefit than everyone else.'

"Sanders and Councilmember Kevin Faulconer will craft the ballot initiative language and lead the signature-gathering effort to place the initiative on the ballot.

" 'This move is in the best interest of both the public and our employees. An unaffordable pension system is not a benefit to anyone,' Faulconer said. 'A 401(K) system makes sense for employers everywhere, and city government should be no different.' [¶] . . . [¶]

"Items that require meet-and-confer, such as reducing the city's retiree health care liability, are currently in negotiations and on track to have a deal by April, in time to implement changes in the next budget. [¶] . . . [¶]

"[']Over the next few months, we'll dedicate ourselves to pursuing any and all ideas in order to permanently solve San Diego's structural budget deficit by the time I leave office,' Sanders said. 'I've never stopped moving toward that goal, and when obstacles rise in my path, I'll seek a way to go around, over or through them.'

"Since taking office in 2005, Mayor Sanders has taken aggressive action to reform city government. He instituted a top-down restructuring of every city department, eliminated more than 1,400 positions, implemented compensation reductions for city employees and created a less costly pension system. To date, Sanders' reform measures have produced a taxpayer savings of more than $180 million a year."

Subsequently, Sanders developed and publicized his pension reform proposal. In January 2011, allies of the mayor formed a campaign committee to raise money for the proposed initiative. The mayor's chief of staff monitored the committee's activities, keeping track of its fundraising and expenditures.

In his January 2011 state of the city address, Sanders vowed to "complete our financial reforms and eliminate our structural budget deficit." He said he was "proposing a bold step" of "creating a 401(k)-style plan for future employees . . . [to] contain pension costs and restore sanity to a situation confronting every big city." He declared that he, along with Faulconer and the city attorney, "will soon bring to voters an initiative to enact a 401(k)-style plan. [¶] We are acting in the public interest, but as private citizens. And we welcome to our effort anyone who shares our goals." On the same day, the mayor's office issued another press release publicizing his vow "to push forward his ballot initiative" for pension reform. The mayor and his staff continued their publicity efforts in the following weeks. The campaign committee hired an attorney and retained the consulting firm that was serving as the city's actuary for its existing pension plan. The firm used its access to the pension system database to provide a fiscal analysis of the impacts of 401(k) plans for new employees.

The pension reform plan announced by DeMaio the previous November differed in some respects from the Sanders proposal. DeMaio's plan did not exempt police and firefighters, and it included a cap on pensionable pay. Two local organizations, the Lincoln Club and the San Diego County Taxpayers Association (Taxpayers Association), supported DeMaio's plan because they considered it stronger than the mayor's. After the state of the city address, members of the business and development community told Sanders that competing measures would confuse the voters, and there would be insufficient funding for two citizens' initiatives. Shortly after a March 2011 press conference at which

6

Sanders presented his latest proposal, some of these individuals told him they were backing DeMaio's plan because it had enough funding to appear on the ballot. They said Sanders could either join them or proceed on his own. A series of meetings between supporters of the competing proposals followed. Sanders, his chief of staff, and Goldstone, the city's chief operating officer, participated in the negotiations. Ultimately, the two sides reached an accord that melded elements of both plans. Newly hired police officers would continue to have a defined benefit pension plan, but newly hired firefighters would receive a 401(k)-style plan like other new employees. A freeze on pensionable pay would be subject to the meet-and-confer process and could be overridden by a two-thirds majority of the city council, but there would be no payroll cap. Sanders called the negotiations "difficult" and testified that he did not like every part of the new proposal, but supported it because it was "important for the City in the long run." Taxpayers Association hired a law firm to draft the initiative measure, using the DeMaio proposal as a starting point. Goldstone and the mayor's chief of staff reviewed drafts and provided comments. City Attorney Goldsmith also reviewed and weighed in on the proposal. After relatively few revisions, the resulting measure was titled the "Citizens' Pension Reform Initiative" (the Initiative).

In April 2011, a notice of intent to circulate the Initiative petition was filed. The proponents were petitioners Catherine A. Boling, T.J. Zane, and Stephen Williams. Zane and Williams were leaders of the Lincoln Club. Boling was treasurer of the San Diegans for Pension Reform. The next day, Sanders, DeMaio, Goldsmith, Faulconer, Boling, and Zane held a press conference to announce the filing. Sanders supported the signature-gathering campaign. He touted its importance in interviews, in media statements, and at speaking appearances. The Initiative appeared in "bullet points" prepared for the mayor's engagements with various groups. He approved a "message from Mayor Jerry Sanders" for

circulation to the San Diego Regional Chamber of Commerce, soliciting their assistance in gathering signatures. Members of his staff provided services in support of the Initiative, such as responding to media requests.

The committee formed to promote the original Sanders proposal contributed $89,000 and other nonmonetary support to the Initiative effort. The proponents gathered sufficient signatures, and the registrar of voters certified the measure in November 2011. The city council then passed a resolution of intent to place the Initiative on the June 2012 election ballot.

Meanwhile, in July 2011 the San Diego Municipal Employees Association (Union) wrote to Sanders, claiming the city had an obligation under the MMBA to meet and confer over the Initiative. When Sanders did not respond, the Union wrote a second letter demanding that the city satisfy its meet-and-confer obligations. City Attorney Goldsmith responded that state election law required the city council to place the Initiative on the ballot without modification, so long as the proponents met the procedural requirements for a citizens' initiative. Goldsmith explained that, "[a]ssuming the proponents . . . obtain the requisite number of signatures on their petition and meet all other legal requirements, there will be no determination of policy or course of action by the City Council, within the meaning of the MMBA, triggering a duty to meet and confer in the act of placing the citizen initiative on the ballot."

The Union responded that the city was required to meet and confer because Sanders was acting in his capacity as mayor to promote the Initiative, and thus "has clearly made a determination of policy *for this City* related to mandatory subjects of bargaining . . . ." The Union claimed Sanders was using the pretense of a " 'citizens' initiative' " as a deliberate tactic to "dodge the City's obligations under the MMBA." Goldsmith's office replied that the city had no meet-and-confer obligations "at this point in the process" because "there is no legal basis

8

upon which the City Council can modify the [Initiative], if it qualifies for the ballot." Instead, the council had to place the Initiative on the ballot if it met the Elections Code requirements. The city accordingly declined to meet and confer. Subsequent demands by the Union and other employee groups were rejected for similar reasons.

The Union filed an unfair practice charge in January 2012 based on the city's refusal to meet and confer, calling the Initiative "a sham device which City's 'Strong Mayor' has used for the express purpose of avoiding City's MMBA obligations." Other unions filed charges as well. The city council voted to place the Initiative on the June 2012 ballot. In February 2012, PERB issued a complaint against the city, alleging that its failure to meet and confer violated the MMBA and constituted an unfair practice. PERB consolidated the various unfair practice claims and appointed an administrative law judge (ALJ) to hold a hearing. It also filed a superior court action to enjoin presentation of the Initiative on the June 2012 ballot.

The trial court declined to issue a preliminary injunction. When the ALJ scheduled a hearing in April 2012, the city sought a stay of the administrative proceedings. The trial court granted the request, and the Union pursued writ relief. In granting relief, the Court of Appeal acknowledged that, "[a]s the expert administrative agency established by the Legislature to administer collective bargaining for covered governmental employees, PERB has exclusive initial jurisdiction over conduct that *arguably* violates the MMBA." (*San Diego Municipal Employees Assn. v. Superior Court* (2012) 206 Cal.App.4th 1447, 1458, italics added.) The court observed that, had the city itself had put the Initiative on the ballot without meeting and conferring with employee unions, its action would have violated the MMBA. The court noted that the Union had alleged, with supporting evidence, that the city had avoided its meet-and-confer obligations by

9

using straw men to place the Initiative on the ballot. This activity arguably violated public employment labor law. (*Id*. at p. 1460.) Accordingly, the court vacated the stay of the administrative proceedings. (*Id*. at p. 1466.)

The Initiative appeared on the June 2012 ballot, with arguments in favor by "Mayor Jerry Sanders" and councilmembers Faulconer and DeMaio. The voters approved it. Sanders spoke at an election night celebration, praising the measure as the latest in a series of fiscal reforms, including his pension reform efforts in 2006 and 2008.

In July 2012 the ALJ held a hearing. The ALJ's proposed decision found that Sanders had chosen to pursue a citizens' initiative measure because he doubted the city council's support and wanted to avoid concessions to the unions. The decision observed that Sanders was a "strong mayor" with collective bargaining responsibilities. It concluded he acted "under the color of his elected office" to pursue the initiative campaign, with support from two city councilmembers and the city attorney. Because this conduct amounted to a policy determination on a negotiable matter, Sanders had a duty to meet and confer with the unions. Furthermore, under common law agency principles, the city had the same meet-and-confer obligation because the mayor was the city's "statutorily defined agent" and the city had had ratified his policy decision.

PERB largely affirmed the ALJ's decision, agreeing that the city was charged with the mayor's conduct under principles of statutory and common law agency. PERB determined that the city had violated the MMBA by deciding, through its agent Sanders, to place the Initiative on the ballot and by acquiescing in Sanders' rejection of meet-and-confer demands. It agreed with the ALJ's finding that the unions "did not demand to bargain over [the Initiative] per se but over the Mayor's policy decision to alter employee pension benefits, including the contents of his proposed ballot measure to reform employee pensions. [Citation.]

10

. . . [E]ven accepting the City's characterization of [the Initiative] as a purely citizens' initiative, the Unions' demands also contemplated the possibility of bargaining over an alternative or competing measure on the subject. [Citation.]"[4] PERB concluded that "[i]n any event, the City's steadfast refusal to respond to the Unions' requests consummated the Mayor's policy decision to reform pension benefits and thereby alter terms and conditions of employment."

PERB modified the ALJ's proposed remedy to vacate the results of the election. Invoking its "make-whole" and "restoration" powers for remedying MMBA violations, PERB directed the city to pay its employees "for all lost compensation, including but not limited to the value of lost pension benefits . . . offset by the value of new benefits required from the City under [the Initiative]." These payments were to continue for as long as the Initiative was in effect, or until the parties mutually agreed otherwise.

The city challenged PERB's decision by writ petition, as authorized by section 3509.5. It named as additional real parties in interest the Initiative's proponents, who filed briefs and a writ petition of their own. The petitions were consolidated. The Court of Appeal ruled that the city was not required to meet and confer before placing the Initiative on the ballot. First, relying on *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 (*Yamaha*), the court stated that while PERB's interpretation of the law governing the duty to bargain "will generally be followed unless it is clearly erroneous," "the judiciary accords no deference to agency determinations on legal questions falling outside the parameters of the agency's peculiar expertise." (*Boling v. Public Employment Relations Bd.* (2017) 10 Cal.App.5th 853, 868, 870.) It then held that a city's

---

[4] PERB noted that in *Howard Jarvis Taxpayers Assn. v. City of San Diego* (2004) 120 Cal.App.4th 374, the city council had responded to a citizens' initiative proposal by placing a competing measure on the ballot.

11

decision to place a citizens' initiative measure on the ballot is purely ministerial and does not trigger the obligation to meet and confer. (*Id*. at pp. 872-873, 875.)

The court reasoned that under sections 3504.5, subdivision (a) and 3505, the MMBA's meet-and-confer requirements apply only to proposals by the governing body of an agency. Because citizen-sponsored initiatives are not from an agency's governing body, they are not subject to bargaining requirements. (*Boling v. Public Employment Relations Bd.*, *supra*, 10 Cal.App.5th at pp. 875, 882, fn. 37.) This statutory interpretation appears to undergird, in part, the court's rejection of PERB's findings that the mayor acted as the city's agent when he developed and promoted the Initiative. (*Id*. at pp. 883, 891, 893.) We need not reach the agency issues to resolve this appeal.

## II. DISCUSSION

A.      *Standard of Review*

We addressed the standard of review for an agency's legal determinations in *American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446. "When an agency is not exercising a discretionary rulemaking power but merely construing a controlling statute, ' "[t]he appropriate mode of review . . . is one in which the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction. [Citation.]" [Citations.]' (*Yamaha*, *supra*, 19 Cal.4th at p. 12.) How much weight to accord an agency's construction is 'situational,' and greater weight may be appropriate when an agency has a ' "comparative interpretive advantage over the courts," ' as when ' "the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion. " ' (*Ibid*., italics omitted.) Moreover, a court may find that 'the Legislature has *delegated* the task of interpreting or elaborating on a statute to an administrative agency,' for example, when the Legislature 'employs open-

12

ended statutory language that an agency is authorized to apply or "when an issue of interpretation is heavily freighted with policy choices which the agency is empowered to make." ' [Citations.]  In other words, the delegation of legislative authority to an administrative agency sometimes 'includes the power to elaborate the meaning of key statutory terms.' [Citation.]  Nevertheless, the proper interpretation of a statute is ultimately the court's responsibility." (*American Coatings*, at pp. 461-462.)

PERB is the agency empowered by the Legislature to adjudicate unfair labor practice claims under the MMBA and six other public employment relations statutes.  (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077, 1090.)  It is settled that "[c]ourts generally defer to PERB's construction of labor law provisions within its jurisdiction.  (See *San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 856 [EERA]; *Paulsen v. Local No. 856 of Internat. Brotherhood of Teamsters* (2011) 193 Cal.App.4th 823, 830 [MMBA].)  '. . . PERB is "one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." [Citation.]' (*Banning Teachers Assn. v. Public Employment Relations Bd.* (1988) 44 Cal.3d 799, 804.)  We follow PERB's interpretation unless it is clearly erroneous.  (*Ibid*.)" (*County of Los Angeles v. Los Angeles County Employee Relations Com.* (2013) 56 Cal.4th 905, 922.)  As noted in *Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 586, interpretation of a public employee labor relations statute " 'falls squarely within PERB's legislatively designated field of expertise,' " dealing with public agency labor relations.  Even so, courts retain final authority to " 'state the true meaning of the statute.' " (*Id*. at p. 587.)  A hybrid approach to review in this narrow area

13

maintains the court's ultimate interpretive authority while acknowledging the agency's administrative expertise.

The standard of review for PERB's factual findings is established by statute. "The findings of the board with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, shall be conclusive."[5] (§ 3509.5, subd. (b).) As we have long recognized, the Legislature is free to specify that certain administrative determinations are subject to substantial evidence review instead of independent review. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824, fn. 17.) Accordingly, in reviewing PERB's findings " 'we do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so. [Citations.] We will uphold the Board's decision if it is supported by substantial evidence on the whole record.' " (*Regents of University of California v. Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 617 [applying § 3564, subd. (c), an identical provision of the Higher Education Employer-Employee Relations Act]; see *City of Palo Alto v. Public Employment Relations Bd.* (2016) 5 Cal.App.5th 1271, 1288.)

Here, the Court of Appeal decided that PERB's determinations were subject to independent review because the facts were undisputed. (*Boling v. Public Employment Relations Bd.*, *supra*, 10 Cal.App.5th at pp. 879-881.) It is true that the application of law to undisputed facts ordinarily presents a legal question that is reviewed de novo. (See *Haworth v. Superior Court*, *supra*, 50 Cal.4th at p. 385; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 378, pp. 436-

---

**5**     "[A] determination is one of ultimate fact if it can be reached by logical reasoning from the evidence, but one of law if it can be reached only by the application of legal principles." (*Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 698, fn. 3; see *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384-385.)

437; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2016) ¶ 8:114, p. 8-81.) However, when the matter falls within PERB's area of expertise, the deferential standard outlined above applies to its legal determinations even if based on undisputed facts. Moreover, it is settled that when conflicting inferences may be drawn from undisputed facts, the reviewing court must accept the inference drawn by the trier of fact so long as it is reasonable. (*Hamilton v. Pacific Elec. Ry. Co.* (1939) 12 Cal.2d 598, 602-603; *Mah See v. North American Acc. Ins. Co.* (1923) 190 Cal. 421, 426; see 9 Witkin, Cal. Procedure, *supra*, Appeal § 376, pp. 434-435; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:60, p. 8-29.)

B.       *Scope of the Duty To Meet and Confer*

On these facts, Mayor Sanders had an obligation to meet and confer with the unions.

"The centerpiece of the MMBA is section 3505, which requires the governing body of a local public agency, or its designated representative, to 'meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of . . . recognized employee organizations.' As we recounted in . . . *Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 335, the MMBA represented an evolution from the earlier George Brown Act, which 'provided only that management representatives should listen to and discuss the demands of the unions.' In its present form, the MMBA mandates that the governing body undertake negotiations with employee representatives not merely to listen to their grievances, but also 'with the objective of reaching "agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year." ' (*Id*. at p.

15

336, quoting § 3505, italics omitted.)"**6** (*Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 780-781, italics omitted.)

"The duty to meet and confer in good faith has been construed as a duty to bargain with the objective of reaching binding agreements between agencies and employee organizations . . . . The duty to bargain requires the public agency to refrain from making unilateral changes in employees' wages and working conditions until the employer and employee association have bargained to impasse . . . ." (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 537.) "The duty to meet and confer in good faith is limited to matters within the 'scope of representation' . . . . Even if the parties meet and confer, they are not required to reach an agreement because the employer has 'the ultimate power to refuse to agree on any particular issue. [Citation.]' [Citation.] However, good faith under section 3505 'requires a genuine desire to reach agreement.' " (*Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 630;

---

**6** Section 3505 provides in full: "The governing body of a public agency, or such boards, commissions, administrative officers or other representatives as may be properly designated by law or by such governing body, shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of such recognized employee organizations, as defined in subdivision (b) of Section 3501, and shall consider fully such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action.

" 'Meet and confer in good faith' means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year. The process should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or when such procedures are utilized by mutual consent."

see *International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public Employment Relations Bd.* (2011) 51 Cal.4th 259, 271.) Here, it is undisputed that these pension benefits fell within the scope of the unions' representation. The question is whether the mayor's pursuit of pension reform by drafting and promoting a citizens' initiative required him to meet and confer with the unions.

*People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach*, *supra*, 36 Cal.3d 591 (*Seal Beach*) involved a related but distinct issue: whether the meet-and-confer provisions of section 3505 applied when a city exercised its *own* constitutional power to propose charter amendments to its voters. (Cal. Const., art. XI, § 3, subd. (b).)[7] We noted that "[t]he MMBA has two stated purposes: (1) to promote full communication between public employers and employees; and (2) to improve personnel management and employer-employee relations within the various public agencies. These purposes are to be accomplished by establishing methods for resolving disputes over employment conditions and by recognizing the right of public employees to organize and be represented by employee organizations. (§ 3500.) While the Legislature established a procedure for resolving disputes regarding wages, hours and other conditions of employment, it did not attempt to establish standards for the wages, hours and other terms and conditions themselves. Rather, it 'set forth reasonable, proper and necessary principles which public agencies must follow in their rules and regulations for administering their employer-employee relations . . . .' " (*Seal Beach*, at p. 597.)

---

[7] "Needless to say," we observed, "this case does not involve the question whether the meet-and-confer requirement was intended to apply to charter amendments proposed by initiative." (*Seal Beach*, *supra*, 36 Cal.3d at p. 599, fn. 8.)

17

The City of Seal Beach claimed its constitutional right to propose charter amendments to the electorate could not be abridged by the Legislature. We disagreed, stating the "truism that few legal rights are so 'absolute and untrammeled' that they can never be subjected to peaceful coexistence with other rules." (*Seal Beach*, *supra*, 36 Cal.3d at p. 598.) Case law had established that "a city's power to amend its charter can be subject to legislative regulation." (*Ibid.*, citing *District Election etc. Committee v. O'Connor* (1978) 78 Cal.App.3d 261, 267.) We approved that precedent and pointed out that section 3505 is "far less intrusive" than the statute at issue in *District Election*, which posed a direct conflict with a charter provision. (*Seal Beach*, at p. 599.) "Cities function both as employers and as democratic organs of government. The meet-and-confer requirement is an essential component of the state's legislative scheme for regulating the city's employment practices. By contrast, the burden on the city's democratic functions is minimal." (*Ibid.*)

We further reasoned that " 'general law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed to be strictly municipal affairs, where the subject matter of the general law is of statewide concern.' [Citation, fn. omitted.] Fair labor practices, uniform throughout the state, are a matter 'of the same statewide concern as workmen's compensation, liability of municipalities for tort, perfecting and filing of claims, and the requirement to subscribe to loyalty oaths.' " (*Seal Beach*, *supra*, 36 Cal.3d at p. 600, quoting *Professional Fire Fighters, Inc. v. City of Los Angeles* (1963) 60 Cal.2d 276, 292, 294-295.) Again we noted the absence of any actual conflict "between the city council's power to propose charter amendments and section 3505. Although that section encourages binding agreements resulting from the parties' bargaining, the governing body of the agency — here the city council — retains the ultimate power to refuse an agreement and to make its own

decision. [Citation, fn. omitted.] This power preserves the council's rights under article XI, section 3, subdivision (b) — it may still propose a charter amendment if the meet-and-confer process does not persuade it otherwise." (*Seal Beach*, at p. 601.)

*Seal Beach* involved a city council's own decision to place a proposal on the ballot, rather than a citizen-sponsored initiative. Nevertheless, *Seal Beach* sets out useful principles. The meet-and-confer requirement of section 3505 is an important feature of state public employee labor relations law, and one that places a relatively "minimal" burden on a local agency's governing functions. (*Seal Beach*, *supra*, 36 Cal.3d at p. 599.) Further, the MMBA aims to foster full communication between public employers and employees and improve employer-employee relations. These purposes require compliance with section 3505, even when an agency decides to take a proposal directly to the voters. (See *Seal Beach*, at pp. 597-601.)

Here, Mayor Sanders conceived the idea of a citizens' initiative pension reform measure, developed its terms, and negotiated with other interested parties before any citizen proponents stepped forward. He relied on his position of authority and employed his staff throughout the process. He continued using his powers of office to promote the Initiative after the proponents emerged. Yet the Court of Appeal determined that the city was not required to meet and confer with its unions at any point. To reach this conclusion, the court distinguished *Seal Beach* based not on section 3505 but on a novel interpretation of section 3504.5, subdivision (a). That provision relates to measures proposed by a governing body or its boards or commissions.[8] It is primarily concerned with an entity's

---

[8] Section 3504.5, subdivision (a) provides: "Except in cases of emergency as provided in this section, the governing body of a public agency, and boards and commissions designated by law or by the governing body of a public agency, shall

19

obligation to give *notice* so that bargaining can take place with sufficient time for a resolution to be reached, if possible.

The Court of Appeal concluded that "the meet-and-confer requirements of the MMBA by its express terms constrain only *proposals* by the '*governing body.*'" (*Boling v. Public Employment Relations Bd.*, *supra*, 10 Cal.App.5th at p. 875.) It quoted section 3504.5, subdivision (a), to the effect that "'the governing body . . . shall give reasonable written notice . . . of any ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted by the governing body.'" (*Boling*, at p. 875.) The court acknowledged that section 3505 requires that "'[t]he governing body . . . shall meet and confer . . . prior to arriving at a determination of policy or course of action.'" (*Boling*, at p. 875.) Yet, "[b]ecause a citizen-sponsored initiative does not involve a proposal *by* the 'governing body,'" the court concluded "there are no analogous meet-and-confer requirements for citizen-sponsored initiatives." (*Ibid.*)

PERB pointed out that section 3505 reaches more broadly. It requires not only the governing body, but also its "other representatives as may be properly designated" to meet and confer with regard to policy decisions made on the agency's behalf. (§ 3505.) The court was not persuaded. "We reject this reading of the statutory scheme. Section 3504.5, subdivision (a) describes *when* meet-and-confer obligations are triggered (i.e., when there is an 'ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation

---

give reasonable written notice to each recognized employee organization affected of any ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted by the governing body or the designated boards and commissions and shall give the recognized employee organization the opportunity to meet with the governing body or the boards and commissions."

20

proposed to be adopted by the governing body'), and section 3505 describes *how* that process should be accomplished, including *who* (i.e., the 'governing body . . . or other representatives as may be properly designated by law or by such governing body') shall participate on behalf of the governing body.  The designation in section 3505 of who shall *conduct* the meet-and-confer process does not expand who *owes* the meet-and-confer obligations imposed by section 3504.5." (*Boling v. Public Employment Relations Bd.*, *supra*, 10 Cal.App.5th at pp. 882-883, fn. 37.)

The court failed to give PERB's statutory interpretation the deference to which it was due.  Sections 3504.5 and 3505 " 'fall[] squarely within PERB's legislatively designated field of expertise.' " (*Cumero v. Public Employment Relations Bd.*, *supra*, 49 Cal.3d at p. 586.)  Thus, the court should have "follow[ed] PERB's interpretation unless it is clearly erroneous." (*County of Los Angeles v. Los Angeles County Employee Relations Com.*, *supra*, 56 Cal.4th at p. 922.)  PERB's reading is not clearly erroneous.  To the contrary, it is clearly correct.

The court's attempt to derive the duty to meet and confer from the notice provision of section 3504.5, subdivision (a) finds no support in precedent or statutory language.  We have consistently located the source of the actual duty to meet and confer in section 3505, where the term "meet and confer" appears and is defined. (E.g., *County of Los Angeles v. Los Angeles County Employee Relations Com.*, *supra*, 56 Cal.4th at p. 922; *Voters for Responsible Retirement v. Board of Supervisors*, *supra*, 8 Cal.4th at p. 780; *Seal Beach*, *supra*, 36 Cal.3d at p. 596.)  As noted, section 3504.5, subdivision (a) is primarily concerned with requiring notice to employee organizations in one particular circumstance:  when a governing body proposes a measure affecting matters within the scope of representation. (See *Building Material & Construction Teamsters' Union v.*

21

*Farrell* (1986) 41 Cal.3d 651, 657.)  It includes no independent requirement to meet and confer, but provides only that the governing body must give the employee organization "the opportunity to meet."  (§ 3504.5, subd. (a).)  Courts have long held that the duty to meet and confer under section 3505 applies *in addition to* the requirements of section 3504.5.  (*Riverside Sheriff's Assn. v. County of Riverside* (2003) 106 Cal.App.4th 1285, 1289-1290; *Vernon Fire Fighters v. City of Vernon* (1980) 107 Cal.App.3d 802, 811; *International Assn. of Fire Fighters Union v. City of Pleasanton* (1976) 56 Cal.App.3d 959, 966.)

Section 3505 expressly imposes the duty to meet and confer on "[t]he governing body of a public agency, or such boards, commissions, *administrative officers or other representatives as may be properly designated by law* or by such governing body."  (Italics added.)  As PERB points out, the duty regularly attaches to actions taken by agency representatives without a governing body's participation.  (E.g., *Indio Police Command Unit Assn. v. City of Indio* (2014) 230 Cal.App.4th 521, 527-528, 539; [police chief reorganized department]; *Holliday v. City of Modesto* (1991) 229 Cal.App.3d 528, 531 540 [fire chief issued drug test directive]; *Long Beach Police Officer Assn. v. City of Long Beach* (1984) 156 Cal.App.3d 996, 999, 1011 [police chief altered practice relating to shooting incidents]; *Solano County Employees' Assn. v. County of Solano* (1982) 136 Cal.App.3d 256, 258, 265 [county administrator altered vehicle use policy].)  Here, the mayor was the city's chief executive, empowered by the city charter to make policy recommendations with regard to city employees and to negotiate with the city's unions.  Under the terms of section 3505, he was required to meet and

22

confer with the unions "prior to arriving at a determination of policy or course of action" on matters affecting the "terms and conditions of employment."**9**

Any doubts as to whether these key terms of section 3505 extended to the mayor's sponsorship of the Initiative must be resolved by adopting "the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the [statute's] general purpose, and to avoid a construction that would lead to unreasonable, impractical, or arbitrary results. [Citations.] We will not adopt '[a] narrow or restricted meaning' of statutory language 'if it would result in an evasion of the evident purpose of [a statute], when a permissible, but broader, meaning would prevent the evasion and carry out that purpose.' " (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291-1292.) Allowing public officials to purposefully evade the meet-and-confer requirements of the MMBA by officially sponsoring a citizens' initiative would seriously undermine the policies served by the statute: fostering full communication between public employers and employees, as well as improving

---

**9** Section 3505 describes the duty as an obligation "personally to meet and confer promptly upon request by either party . . . ." Consistent with its earlier decisions, PERB interprets this provision to require that employers provide employee representatives with reasonable advance notice and an opportunity to bargain *before* reaching a firm decision to establish or change a policy within the scope of the representation. (See, e.g., *City of Sacramento* (2013) PERB Dec. No. 2351-M, p. 28; *County of Santa Clara* (2013) PERB Dec. No. 2321-M, p. 21.)

We need not decide precisely when the mayor's duty to meet and confer was triggered here because it clearly arose at least by the time the unions submitted their first demand letter. Although the Initiative was circulating for signatures by that time, PERB and the unions suggest the parties could have discussed circulating an alternative, less drastic, pension measure or delaying the Initiative's placement on the ballot to permit consideration of other alternatives. (See *Jeffrey v. Superior Court* (2002) 102 Cal.App.4th 1, 6 [Elections Code imposes no maximum time limit on when initiatives to amend city charters must be placed on ballot].) We express no view on the viability of these topics as subjects of bargaining.

23

personnel management and employer-employee relations.  (§ 3500; *Seal Beach*, *supra*, 36 Cal.3d at p. 597.)

Under the facts presented here, Sanders pursued pension reform as a matter of policy while acting as the city's chief executive officer.  As a "strong mayor" and the city's designated bargaining agent, he was required to meet and confer with employee representatives in this process.  The obligation to meet and confer did not depend on the means he chose to reach his policy objectives or the role of the city council in the process.  Because the mayor was directly exercising his executive authority on behalf of the city, no resort to agency principles is required to bring him within the scope of section 3505.  Moreover, even if one could argue Sanders acted beyond the scope of his mayoral authority, it cannot be that an executive action within the scope of the executive's authority would trigger the duty to meet and confer but one exceeding that authority would not.  Such a rule would be contrary to the broad purposes of the MMBA.  The relevant question is whether the executive is using the powers and resources of his office to alter the terms and conditions of employment.

Here the answer is plainly "yes."  Sanders informed San Diegans that he would place a pension reform measure on the ballot as part of his "agenda to streamline city operations, increase accountability and reduce pension costs . . . by the time he leaves office."  In his state of the city address, he formally recommended to the city council the "policy" of substituting 401(k)-style plans for defined benefit pensions, as well as the "course of action" of pursuing reform by way of a citizens' initiative measure.  He pledged to work with others in city government to achieve this goal, and he did.  He and his staff were deeply involved in developing the proposal's terms, monitoring the campaign in support of it, and assisting in the signature-gathering effort.  He signed ballot arguments in favor of the measure as "Mayor Jerry Sanders."  He consistently invoked his

24

position as mayor and used city resources and employees to draft, promote, and support the Initiative. The city's assertion that his support was merely that of a private citizen does not withstand objective scrutiny.

The line between official action and private activities undertaken by public officials may be less clear in other circumstances. However, when a local official with responsibility over labor relations uses the powers and resources of his office to play a major role in the promotion of a ballot initiative affecting terms and conditions of employment, the duty to meet and confer arises. Whether an official played such a major role will generally be a question of fact, on which PERB's conclusion is entitled to deference. (§ 3509.5, subd. (b).) Substantial evidence supports PERB's conclusion here that Sanders's activity created an obligation to meet and confer.

Finally, in reversing the ALJ on the question of remedy, PERB observed that it is the province of courts alone to invalidate the results of an initiative election. PERB therefore ordered a make-whole remedy based on compensation lost as a result of the Initiative. The Court of Appeal did not consider the remedy issue because it concluded Sanders and the city had not violated the duty to meet and confer. On remand, the court should address the appropriate judicial remedy for the violation identified in this opinion.

## III.  DISPOSITION

We reverse the Court of Appeal's judgment and remand for further proceedings to resolve issues beyond the scope of this opinion.

**CORRIGAN, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**MILLER, J.** *

---

\*      Associate Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Boling v. Public Employment Relations Board

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 10 Cal.App.5th 853
**Rehearing Granted**

_____

**Opinion No.** S242034
**Date Filed:** August 2, 2018

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Lounsberry Ferguson Altona & Peak, Kenneth H. Lounsbery, James P. Lough, Alena Shamos and Yana L. Ridge for Petitioners and Real Parties in Interest Catherine A. Boling, T.J. Zane and Stephen B. Williams in Nos. D069626 and D069630.

Jan I. Goldsmith and Mara W. Elliott, City Attorneys, Daniel F. Bamberg and George F. Schaefer, Assistant City Attorneys, Michael Travis Phelps, Chief Deputy City Attorney, and Walter C. Chung, Deputy City Attorney, for Petitioner and Real Party in Interest City of San Diego in Nos. D069630 and D069626.

Jones Day, Beth Heifetz, Gregory G. Katsas, G. Ryan Snyder, Karen P. Hewitt and Brian L. Hazen for San Diego Taxpayers Educational Foundation as Amicus Curiae on behalf of Petitioner and Real Party in Interest City of San Diego in Nos. D069630 and D069626.

Renne Sloan Holtzman Sakai, Arthur A. Hartinger, Jonathan V. Holtzman and Alexander Volberding for League of California Cities, California State Association of Counties and International Municipal Lawyers Association as Amici Curiae on behalf of Petitioner and Real Party in Interest City of San Diego in Nos. D069630 and D069626.

Meriem L. Hubbard and Harold E. Johnson for Pacific Legal Foundation, Howard Jarvis Taxpayers Association and National Tax Limitation Committee as Amici Curiae on behalf of Petitioner and Real Party in Interest City of San Diego in Nos. D069630 and D069626.

J. Felix de La Torre, Wendi L. Ross, Mary Weiss and Joseph W. Eckhart for Respondent.

Weinberg, Roger & Rosenfeld, Kerianne R. Steel and Anthony J. Tucci for Service Employees International Union, California State Council as Amicus Curiae on behalf of Respondent.

Smith, Steiner, Vanderpool & Wax and Ann M. Smith for Real Party in Interest San Diego Municipal Employees Association in No. D069630.

**Page 2 – S242034 – counsel continued**

**Counsel:**

Smith, Steiner, Vanderpool & Wax and Fern M. Steiner for Real Party in Interest San Diego City Firefighters Local 145, IAFF, AFL-CIO in No. D069626.

Rothner, Segall & Greenstone, Ellen Greenstone and Connie Hsiao for Real Party in Interest AFCSME, AFL-CIO, Local 127 in No. D069626.

Law Offices of James J. Cunningham and James J. Cunningham for Real Party in Interest Deputy City Attorneys Association of San Diego in No. D069626.

Leonard Carder, Andrew J. Ziaja and Arthur Liou for International Federation of Professional and Technical Employees Local 21, Operating Engineers Local Union No. 3 and Marin Association of Public Employees as Amici Curiae on behalf of Real Parties in Interest and Respondent.

Reich, Adell & Cvitan, Marianne Reinhold, Laurence S. Zakson and William Y. Sheh for Orange County Attorneys Association as Amicus Curiae on behalf of Real Parties in Interest and Respondent.

Woodley & McGillivary, Thomas A. Woodley and William W. Li for The International Association of Fire Fighters as Amicus Curiae on behalf of Real Parties in Interest.

Law Office of Michael A. Conger and Michael A. Conger for San Diego Police Officers Association as Amicus Curiae on behalf of Real Parties in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Alena Shamos
Lounsberry Ferguson Altona & Peak
960 Canterbury Place, Suite 300
Escondido, CA  92025-3836
(760) 743-1201

Michael Travis Phelps
Chief Deputy City Attorney
1200 Third Avenue, Suite 1100
San Diego, CA  92101
(619) 533-5800

Wendi L. Ross
Public Employment Relations Board
1031 18th Street
Sacramento, CA  95811-4124
(916) 322-3198

Ann M. Smith
Smith, Steiner, Vanderpool & Wax
401 West A Street, Suite 320
San Diego, CA  92101
(619) 239-7200