Filed 2/26/24; Certified for Publication 3/18/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KERN COUNTY HOSPITAL AUTHORITY, | F085586 |
| Petitioner, | |
| v. | (PERB Dec. No. 2847-M, Case No. LA-CE-1451-M) |
| PUBLIC EMPLOYMENT RELATIONS BOARD, | |
| Respondent; | **OPINION** |
| SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 521, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of extraordinary relief.

Liebert Cassidy Whitmore, Adrianna E. Guzman and Anni Safarloo; Karen S. Barnes, for Petitioner.

J. Felix De La Torre, Wendi L. Ross, Mary Weiss and Diana Suarez, for Respondent.

Weinberg, Roger & Rosenfeld, Kerianne R. Steele and Maximillian D. Casillas, for Real Party in Interest.

-ooOoo-

Service Employees International Union, Local 521, filed with the Public Employment Relations Board, an unfair practice charge against Kern County Hospital Authority. The dispute at issue was centered on the scope of the applicable grievance procedure with respect to collective grievances, in light of the parties' practices and the then-current Memorandum of Understanding negotiated between Kern County Hospital Authority and Service Employees International Union, Local 521.

The Public Employment Relations Board's Office of the General Counsel issued an administrative complaint in relation to the unfair practice charge. Thereafter, a hearing was held before an administrative law judge (ALJ) on the unfair practice charge and complaint. The ALJ issued a proposed decision in favor of Service Employees International Union, Local 521. Kern County Hospital Authority filed exceptions to the ALJ's proposed decision, which was duly reviewed in light of those exceptions by the Public Employment Relations Board. The Public Employment Relations Board issued its own decision affirming the ALJ's proposed decision.

Kern County Hospital Authority thereafter filed in this court, a petition for writ of extraordinary relief from the decision issued by the Public Employment Relations Board. The Public Employment Relations Board appeared as the Respondent. Service Employees International Union, Local 521 appeared as real party in interest. We affirm the decision of the Public Employment Relations Board and deny Kern County Hospital Authority's petition for writ of extraordinary relief.

## FACTUAL BACKGROUND

### A.     The Parties

Petitioner Kern County Hospital Authority (Authority) is a local "public agency" under the Meyers-Milias-Brown Act (MMBA) and the owner and operator of Kern Medical Center (KMC).[1]  (See Gov. Code, § 3501, subd. (c).)  Respondent Public

---

[1]  The MMBA is codified at Government Code section 3500, et seq.

2.

Employment Relations Board (PERB) is a state agency tasked with administering the MMBA. Real party in interest, Service Employees International Union, Local 521 (SEIU or Union) is an "employee organization" under the MMBA. (See Gov. Code, § 3501, subd. (a).) SEIU represents Authority employees in six distinct bargaining units (supervisory; professional; technical services; clerical; administration; trades/crafts/labor) as the exclusive "recognized employee representative" for Authority employees. (See Gov. Code, § 3501, subd. (b).)

KMC was previously owned and operated by Kern County (County) but was transferred to the Authority's control under a process outlined in the Kern County Hospital Authority Act of 2014 (KCHAA). (See Health & Saf. Code, § 101852, et seq.) The transfer of KMC's ownership and employees to the Authority was completed on July 1, 2016.

The KCHAA addressed various transition issues, including the impact of the transfer on existing employees and employee organizations, as well as on the terms and conditions of employment. The KCHAA required the Authority to continue to recognize SEIU, continue to provide the same level of employee benefits whether the obligation to provide those benefits arose from a memorandum of understanding (MOU) or law, and extend for 24 months and continue to be bound by any existing memoranda of understanding with employee representatives. (Health & Saf. Code, § 101853.1, subd. (d)(1)-(3).)

B.    The Applicable MOUs and Their Grievance and Arbitration Provisions

When the Authority took control of KMC in July 2016, under the terms of the KCHAA, an existing 2015-2017 MOU between the County and SEIU was applied to the Authority and extended to July 2018 (we will refer to this MOU as the 2015-2017 MOU). Thereafter, a new MOU was negotiated by the Authority and SEIU and adopted for the period from September 2018 to October 2020 (we will refer to this MOU as the 2018-2020 MOU). The grievance and arbitration provisions of each MOU are set forth in

3.

Article VIII (Grievance and Arbitration Procedure) thereof and are *identical*. Article VIII contains eight sections entitled: A. Objectives, B. Definitions, C. Exclusions, D. Time Limits, E. The Parties' Rights and Restrictions, F. Informal Grievance Disposition, G. Formal Grievance Procedure, and H. Selection of the Arbitrator, respectively.[2] We will briefly summarize the relevant sections of Article VIII to indicate the scope and substance of Article VIII.

Section A of Article VIII of the MOUs addresses the "Objectives" of the grievance and arbitration procedure. The objectives include resolving disputes informally at the lowest possible level; preventing future complaints of the same nature; providing an orderly procedure for handling disputes; promoting harmonious labor relations; and assuring fair and equitable treatment of all employees.

Section B of Article VIII of the MOUs addresses "Definitions" applicable to the grievance and arbitration procedure. A "grievance" is defined as a "complaint by an employee, alleging a violation of this MOU, rules and regulations or policies governing personnel practices and working conditions" or a complaint that arises "when the employee believes an injustice has been done because of an unfair application [of] or deviation from a departmental policy." The term "employee" is defined as "[a]ny represented employee currently employed by the Authority, regardless of status."

Section C of Article VIII of the MOUs addresses "Exclusions" from the grievance and arbitration procedure. Excluded disputes include disputes concerning certain work assignments, classification and salary decisions, performance evaluations, and certain disciplinary and similar employment decisions. Also excluded are "[g]rievances filed after 20 days from date of occurrence, or after 20 days from the date the employee had

---

[2] While the terms of the 2015-2017 MOU and the 2018-2020 MOU are identical, the 2015-2017 MOU does not enumerate Article VIII's constituent sections with reference to letters of the alphabet, while the 2018-2020 MOU does. We have listed the sections as enumerated in the 2018-2020 MOU for purposes of clarity.

knowledge of an occurrence." Finally, Section C excludes from the grievance procedure, "[i]mpasses in meeting and conferring upon terms of a proposed MOU." (MOU, Article VIII, Section C.6.)

Section E of Article VIII enumerates various "rights and restrictions" applicable to parties to a grievance. These provisions reflect employees' right to representation and the relationship of employees to the exclusive representative. Section E recognizes "the right of any employee to present a grievance individually"[3] and the right to "have a representative present at all steps of the grievance procedure," provided the representative is "from within a recognized employee organization" and his or her identity "is made known to management prior to a scheduled grievance meeting."

Section E also guarantees employees a right to "[r]easonable time in processing a grievance … during regular working hours with advanced supervisor approval," and further provides that such approval "will not be unreasonably withheld." This provision addressing approval of time off work for processing a grievance does not distinguish between an employee who is a grievant and an employee who is acting as a Union steward or in another Union role.

Finally, Section E provides: "Grievances of an identical nature concerning the same subject matter may be consolidated." (MOU, Article VIII, Section E.7.) Section E does not mention "group" or "class" grievances, which terms also do not appear elsewhere in the MOU.

Section F of Article VIII outlines an informal grievance resolution procedure, while Section G delineates a formal grievance resolution procedure. The formal resolution procedure consists of three steps, with step one involving a meeting with a supervisor, step two involving "the next higher level of supervision and department head

---

[3] Article VIII, Section E.2 provides: "The grievance procedure shall not limit the right of any employee to present a grievance individually."

jointly," and step three involving an appeal to "the Employee Relations Representative." Failing a satisfactory resolution at step three, "the employee" can "submit the grievance through the Union to arbitration." "In the event the Union determines not to advance a matter to arbitration, the employee shall have no independent right to advance the matter to arbitration."

Section H of Article VIII addresses the mechanics of the arbitration procedure applicable to "the parties" should a dispute proceed to arbitration. Section H specifies that "[t]he arbitrator's decision shall be binding upon all parties and any monetary settlement awarded to the grievant by the arbitrator shall be limited to a maximum of $5,000."

Here, the parties largely focus on Article VIII, Section B (specifically, the definition set forth therein of a "grievance" as a "complaint by an employee, alleging a violation of this MOU") and Article VIII, Section E (specifically, the provision therein to the effect that "[g]rievances of an identical nature concerning the same subject matter may be consolidated").

### C. The Handling, in the Past, of Group and/or Class Grievances Under the Applicable MOUs by the County and the Authority, Respectively

As discussed in more detail below, after the Union filed the unfair labor practice charge at issue in this matter, a hearing was held on the issue before an ALJ. The dispute at issue at the hearing was centered on the scope of the applicable grievance procedure with respect to collective grievances, in light of the parties' practices and the 2018-2020 MOU negotiated between Kern County Hospital Authority and SEIU. Ronald Hansen, a retired SEIU Local 521 employee, testified at the hearing on behalf of the Union. Hansen was employed by SEIU Local 521 for a little over five and a half years, from 2015 to 2021, as a contract enforcement specialist and, upon obtaining a promotion, as a senior contract enforcement specialist. In light of the subject of the dispute, Hansen discussed the handling in the past (i.e., over the period from 2015 to 2019), of a number of group

grievances pertaining to KMC bargaining unit employees, by Kern County and its successor with respect to KMC operations, the Authority, respectively.

The grievances addressed at the administrative hearing were referred to as the 2015 Regina Kane grievance (handled by the County); the 2016 Encarnacion Venegas grievance (handled by the County); the 2018 Lerdo grievance (handled by the Authority); and the 2019 Nancy Halsell grievance (handled by the Authority). Lisa Hockersmith (Vice President of Human Resources for the Authority) and Renita Nunn (the Authority's Director of Employee Labor Relations and Human Resources Director) also addressed these grievances in their respective testimony at the administrative hearing.

### 1. *2015 Kane "Group Grievance" (Handled by Kern County)*

In December 2015, SEIU filed a "group grievance" with Kern County on behalf of an SEIU bargaining team member, Regina Kane, and other unnamed employees; the grievance was styled "Regina Kane, et al." While Regina Kane did not work at KMC but rather at Kern County's Behavioral Health Department, SEIU filed the Kane "group grievance" on behalf of "all affected bargaining units." The grievance was submitted and signed by Ronald Hansen of SEIU.

### 2. *2016 Venegas "Group Grievance" (Handled by Kern County and the Authority)*

In April 2016, Encarnacion Venegas, SEIU shop steward and employee in KMC's respiratory department, filed a "group grievance" on behalf of himself and other respiratory department employees. The grievance specified it was filed on behalf of "E. Venegas, Steward, et al. affected employees." In April 2016, when this grievance was filed, the transfer of KMC from the County to the Authority was underway but had not been completed. Lisa Hockersmith, KMC's vice president of human resources at the time, responded to the grievance in writing in May 2016. In February 2017, after KMC

7.

was under the Authority's control, the Authority and SEIU settled the grievance on a group or class basis for the benefit of KMC's affected respiratory therapists.[4]

### 3. 2018 Lerdo "Group Grievance" (Handled by the Authority)

In August 2018, SEIU submitted a grievance in the form of a letter signed by nine employees, to the Authority (the other grievances discussed here utilized SEIU or County "grievance forms").  The letter, which was on SEIU letterhead and submitted to the Authority by Stephen Cutty (Regional Director of SEIU Local 521), described the substance of the grievance and identified "[t]he remedy sought by the Union" on behalf of the affected employees.  Lisa Hockersmith responded to SEIU (specifically to Mr. Cutty) in writing in September 2018, referring to this grievance as the "Lerdo Group Grievance," since the affected employees worked as KMC medical staff at the "Lerdo Correctional Facility."  Hockersmith's response noted:  "Although the Memorandum of Understanding (MOU) does not expressly authorize the filing of group grievances, we recognize that it does allow grievances alleging similar facts to be consolidated. Accordingly, we are treating this 'group' grievance as SEIU's request to consolidate what would otherwise be individually filed grievances."

### 4. 2019 Halsell Group Grievance (Handled by the Authority)

In July 2019, SEIU submitted a group grievance, "Nancy F. Halsell et al.," to the Authority on behalf of a total of 23 employees (the grievance was signed by Ronald Hansen and the employees).  Hockersmith acknowledged in her hearing testimony in the instant matter that the Authority did not object to the collective or group nature of this grievance.  Her written response to the grievance (which was addressed to Ronald Hansen of SEIU) similarly did not contain any objection to the collective or group nature of the grievance.  Rather, Hockersmith's written response stated:  "Pursuant to the formal

---

[4] The settlement agreement stated that the underlying grievance had been *filed by SEIU* "on behalf of the unit members affected," that is, affected respiratory therapists. The settlement agreement afforded relief to 18 affected respiratory therapists.

grievance procedure, if Ms. Halsell and the others listed [on the grievance] are not satisfied with this decision, they may, through SEIU, submit this grievance to arbitration by written notice" to the Authority. Ultimately, in February 2020, the Authority settled with SEIU, on a group or class basis, the dispute at issue in the grievance. The settlement agreement between the Authority and SEIU noted that "after the Parties agreed to submit the [Halsell, et al.] Grievance to arbitration and a hearing was scheduled, the Authority discovered that it had, in fact, inadvertently" engaged in the disputed conduct and then "remedied its oversight." The settlement agreement further noted that the affected employees had thus "been made whole," and in return SEIU had "agree[d] to withdraw the [Halsell, et al.] Grievance."

The evidence adduced at the administrative hearing indicated that neither the County, nor the Authority, had ever declined to entertain a collective grievance. Specifically, Ronald Hansen testified he was not aware of a group or class grievance ever being rejected by the owners/operators of KMC, and there was no evidence to the contrary.

### D.     The Instant Dispute

SEIU filed a fifth grievance, in 2019, on behalf of a Union member, Eva-Marie Dominguez, disputing the allocation of time she had recently taken off due to illness to paid-time-off bank, rather than to extended-illness bank, to pay her for the days she was absent from work. The Dominguez grievance was set for arbitration (between the Authority and SEIU), but on January 7, 2020, a couple of weeks before the arbitration was set to begin, SEIU requested the arbitrator to amend the Dominguez grievance to make it a "class-action grievance," as SEIU had become aware of at least four additional employees who were allegedly in the same situation as Dominguez.[5]

_____

[5] Ronald Hansen testified at the administrative hearing in the instant matter that a group grievance is one to which multiple named employees have signed on, while a class grievance or class-action grievance encompasses affected, but unnamed, employees.

9.

On January 13, 2020, the Authority objected to SEIU's proposed amendment asserting that under the terms of the MOU, specifically Article VIII, Section B, "a grievance by its very definition is by a singular employee."[6]  As for the consolidation provision set forth in Article VIII, Section E to the effect that grievances "may be consolidated," the Authority asserted that "consolidation for purposes of a hearing does not equate to a group grievance," and further that this provision was merely permissive in that consolidation implicitly required mutual consent of the parties.  The Authority posited that "consolidation is not an absolute right and there is no indication in the MOU that the consolidation can occur at any time, upon the demand of a party without the agreement of the other party."

The Authority made these objections, including the assertion that "a grievance by its very definition is by a singular employee," around the same time it was settling the Halsell, et al. grievance on a group basis.  The Halsell, et al. grievance, which was submitted by SEIU on behalf of several employees, was scheduled for an arbitration hearing between the Authority and SEIU, when the matter settled on January 20, 2023.

SEIU concluded the Authority's assertions in opposing SEIU's motion to amend the Dominguez grievance to make it a class grievance, amounted to a unilateral change from the parties' past practice of consolidating grievances and adjudicating group and class grievances.[7]

---

[6]  The Authority made this objection around the same time it was settling the Halsell, et al. grievance on a group basis (that settlement agreement was signed on January 20, 2023).

[7]  The Authority also objected to SEIU's request to amend the grievance to make it a class grievance on grounds the request for amendment was brought too late in the proceedings and would prejudice the Authority.

## PROCEDURAL HISTORY

### A.     The Unfair Practice Charge and PERB Complaint

On May 22, 2020, SEIU filed an unfair practice charge against the Authority alleging that the Authority's refusal to permit class and/or group grievances violated the MMBA as it was a unilateral change that interfered with SEIU's ability to represent employees.

On June 22, 2020, the Authority filed a response asserting that the Authority did not impose a change because its actions were consistent with the parties' MOU.  The Authority asserted that the definition of grievance in the MOU indicates that a grievance is to be filed "by a singular employee."  It also noted that the consolidation provision of the MOU incorporated the word 'may," not "shall," which language indicated that consolidation was only permissive and required mutual consent.  The Authority further asserted that SEIU had failed to show "a past practice of group grievances or group arbitrations," in that it "ha[d] not alleged any facts showing that group grievances/group arbitrations were a fixed and established practice accepted by both parties over a reasonable period of time."

On February 10, 2021, PERB's Office of the General Counsel issued an administrative complaint alleging that the Authority violated the MMBA by not affording SEIU an opportunity to meet and confer before implementing a new policy.  The complaint stated, inter alia:  "Before January 13, 2020, [the Authority's] policy concerning grievances was grievances over a matter that affected multiple employees could be considered in a class grievance."  The complaint further provided:  " 'On or about January 13, 2020, [the Authority] changed this policy by asserting that the Union has no right to file class grievances, and that Respondent is under no obligation to hear

11.

class grievances, thereby refuting the past practice of the parties.' "[8] On March 2, 2021, the Authority filed an answer, in which it denied imposing a new policy and asserted its actions were consistent with the "clear and unambiguous terms of the applicable Memorandum of Understanding ('MOU') in effect at the time of the alleged unfair practice." The authority also asserted multiple affirmative defenses including "statute of limitations" and "waiver" defenses.

On April 16, 2021, PERB conducted an informal mediation with the parties, but the matter did not settle.

**B.      The ALJ Administrative Hearing and the ALJ's Proposed Decision**

On August 19-20, 2021, an administrative hearing was held before an ALJ with regard to SEIU's unfair practice charge and the PERB General Counsel's complaint. The primary issues addressed by the ALJ were whether, in refusing to process class, group, and consolidated grievances, the Authority unilaterally adopted a new policy or interpretation without bargaining with SEIU, in violation of the MMBA, and whether the Authority's stance could be harmonized with the representational rights of SEIU and KMC employees under the MMBA.

Ronald Hansen testified at the administrative hearing that a group grievance is one to which multiple employees have signed on, while a class grievance or class-action grievance encompasses affected, but unnamed, employees. However, in practice any distinctions between the terms group, class, and consolidated grievances were not stringently applied by either side. The ALJ indicated the parties had not necessarily and consistently distinguished between group, class, and consolidated grievances, but he deemed the distinctions immaterial in the sense that the dispute at issue encompassed all of these types of collective grievances, including grievances filed by the Union "in its

---

[8]  This language was added to the complaint via amendment August 17, 2021, replacing a different formulation.

own name, but on behalf of unnamed employees."[9] Subsequently, the Board adopted the ALJ's approach on this point, in recognizing that the parties had blurred the distinction between group, class, and consolidated grievances by using these terms in an overlapping fashion.

At the administrative hearing conducted by the ALJ, Lisa Hockersmith testified that the Authority was not required to accept group, class, or consolidated grievances. Renita Nunn similarly testified, with regard to the Authority's position it was not required to accept collective grievances, that it made no difference whether such a grievance was submitted by a group of employees or by the Union on behalf of a group of employees. Hockersmith and Nunn, however, acknowledged that the Authority had accepted collective grievances on a couple of occasions, referring specifically to the Lerdo and Halsell grievances.

Following the administrative hearing, each party filed a post-hearing brief. The ALJ issued his proposed decision on May 23, 2022. The ALJ noted: "Here, the Authority has unilaterally adopted a new policy reserving to itself discretion to refuse to process all group or class grievances where previously the parties had no clear agreement or established past practice." The ALJ found that the Authority—inasmuch as it claimed a categorical right to refuse to process group, class, and consolidated grievances—violated the MMBA by unilaterally adopting a policy regarding a negotiable subject where previously there was no clear policy or practice, without affording SEIU notice

_____

[9] The ALJ stated, inter alia: "The Amended Complaint refers only to 'class' grievances but according to Local 521, the parties' representatives in this case have used the term interchangeably with 'group' grievances. Although I believe there is a meaningful distinction, as explained below, the evidence presented and the parties' briefs clearly addressed both 'group' grievances, i.e., grievances filed by multiple employees, and 'class' grievances in which Local 521 filed a grievance in its own name, but on behalf of unnamed employees. Because the parties clearly understood the present dispute to concern both categories of grievances, I disregard the oversight or omission in the Amended Complaint as nonprejudicial."

13.

and an opportunity to bargain.[10]  In terms of a remedy, the ALJ ordered the Authority to post a notice to inform employees of the violation, and to process group and class grievances.

On July 5, 2022, the Authority filed with the Board, four exceptions to the ALJ's proposed decision.  First, the Authority asserted the ALJ should have dismissed SEIU's charge because it was untimely filed.  The Authority alleged that Hockersmith's 2018 response to the Lerdo grievance (i.e., the letter submitted by SEIU signed by nine employees) put SEIU on notice that the Authority construed the consolidation provision as conditioning consolidation on the consent of the parties, which consent the Authority could unilaterally grant or withhold (see *ante*, discussion of Lerdo grievance).  The Authority further posited that, since SEIU filed its unfair practice charge with PERB in May 2020, more than six months after Hockersmith's 2018 response, the charge was untimely filed.

Second, the Authority claimed, "the proposed decision incorrectly determined that grievance and arbitration procedures are not a creation of contract but statutory rights."  The authority argued that "the grievance and related arbitration process are contractual rights that must be negotiated so as to include the right to a group or class grievance."

Third, the Authority contended that "[t]he ALJ's interpretation of the MOU ignores the plain language of the MOU" and "the defined terms of the MOU."  The Authority asserted, "it is clear from the MOU's plain language that [the parties] agreed to a grievance process and associated arbitration process that only allows for the filing of

---

[10]  The ALJ summarized his ruling as follows:  "Upon the foregoing findings of fact and conclusions of law, and the entire record in the case, the KERN COUNTY HOSPITAL AUTHORITY (Authority) is found to have violated the Meyers-Milias-Brown Act, Government Code section 3500, et seq., by unilaterally adopting a new policy of employer discretion to refuse to process 'class' or 'group' grievances filed by SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 521 (Local 521) or employees of the Authority represented by Local 521 where previously no clearly established policy or past practice existed."

individual grievances with the permissive ability to consolidate grievances of identical nature concerning the same subject matter, i.e., the Authority may agree to combine identical grievances." The Authority argued that thus, "the parties agreed to a single employee grievance process where consolidation was only permissive as evidenced by the clear language of the MOU." (Unnecessary italics omitted.)

Fourth, the Authority contended the ALJ's reliance on PERB decisional law regarding waiver of statutory rights of unions and employees was misplaced because the terms of the MOU govern the instant dispute and statutory rights are not implicated. The Authority argued that the ALJ's proposed decision therefore "incorrectly applies the standard for waiver of a statutory right" to the instant dispute. (Unnecessary capitalization omitted.)

### C. The Board's Decision

On December 20, 2022, the Board issued Services Employees International Union, Local 521 v. Kern County Hospital Authority (2022) PERB Decision No. 2847-M, "affirm[ing] the [ALJ's] proposed decision" and "summariz[ing] and supplement[ing] the ALJ's analysis on the most critical points."

Preliminarily, the Board noted: "[T]he record reflects that the parties often used the terms 'group,' 'class,' and 'consolidated' in such an overlapping manner that it is not possible to delineate clear boundaries between these terms." The Board further noted that the Authority had opposed SEIU's request to amend the Dominguez grievance to make it a collective grievance on grounds, inter alia, that "the MOU bars group or class grievances altogether and permits consolidated grievances only by mutual agreement, meaning the Authority had discretion to refuse all group, class, and consolidated grievances."

Addressing the Authority's exceptions under a de novo standard, the Board first rejected the Authority's claim that SEIU untimely filed the instant unfair practice charge. The Board determined: "Hockersmith's response to the Lerdo grievance does not prove

15.

that SEIU knew or should have known in 2018 that the Authority was asserting a categorical right to reject group, class, and consolidated grievances.  That notice did not come until January 2020, when the Authority asserted this position in response to SEIU's motion to amend the Dominguez grievance."  The Board concluded:  "We therefore affirm the ALJ's decision to reject the Authority's statute of limitations defense."[11]

Next, the Board found SEIU had made a prima facie case showing that the Authority implemented an unlawful unilateral change to a matter within the scope of representation, which change amounted to a per se violation of the duty to meet and confer.  The Board stated:  "The Authority asserts that its January 2020 opposition to SEIU's motion to amend the Dominguez grievance merely restated the status quo as already reflected in the parties' MOU and Hockersmith's 2018 response to the Lerdo grievance.  We conclude, however, that the Authority's January 2020 opposition announced a new policy where there was none before—or applied or enforced an existing policy in a new way—by declaring that the MOU bars group or class grievances and grants the Authority unilateral authority to refuse to consolidate grievances."  In this context, the Board noted the Authority's position was untenable in part because "it ha[d] failed to consistently express what differences (if any) it sees between group, class, and consolidated grievances."  The Board emphasized that "the position the Authority asserted in January 2020, claiming that the parties' MOU granted it the right to reject group, class, or consolidated grievances on purely procedural grounds, materially altered the status quo in a manner that could affect future cases."

Finally, applying the same standard as the ALJ, the Board rejected the Authority's affirmative defense that SEIU had waived its statutory right to file union grievances on

---

[11]  The Authority has not challenged here the Board's rejection of the Authority's claim below that Hockermith's statement triggered the statute of limitations and rendered SEIU's charge untimely.  (See Petitioner's opening brief at pp. 21-27.)

behalf of multiple employees and its statutory right to bargain before the Authority changed the status quo.

In sum, the Board determined: "[T]he Public Employment Relations Board (PERB) finds that the Kern County Hospital Authority violated the Meyers-Milias-Brown Act, Government Code section 3500 et seq. (MMBA), when it unilaterally adopted a new policy, or applied or enforced existing policy in a new way, without affording SEIU notice and an adequate opportunity to bargain."

## DISCUSSION

### I.     Standard of Review

"PERB is the agency empowered by the Legislature to adjudicate unfair labor practice claims under the MMBA and six other public employment relations statutes." (*Boling v. Public Employee Relations Board* (2018) 5 Cal.5th 898, 911 (*Boling*).)  "It is settled that '[c]ourts generally defer to PERB's construction of labor law provisions within its jurisdiction.' "  (*Ibid.*; *Banning Teachers Assn. v. Public Employee Relations Board* (1988) 44 Cal.3d 799, 804 [" '[T]he relationship of a reviewing court to an agency such as PERB, whose primary responsibility is to determine the scope of the statutory duty to bargain and resolve charges of unfair refusal to bargain, is generally one of deference.' "].)  Accordingly, " '[w]e follow PERB's interpretation unless it is clearly erroneous.' "  (*Boling* at p. 912.)  In short, "interpretation of a public employee labor relations statute ' "falls squarely within PERB's legislatively designated field of expertise," ' dealing with public agency labor relations" and "the deferential standard outlined above applies to its legal determinations."  (*Id.* at pp. 912, 913.)

"The standard of review for PERB's factual findings is established by statute." (*Boling*, *supra*, 5 Cal.5th at p. 912.)  " 'The findings of the board with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the

record considered as a whole, shall be conclusive.' "[12] (Gov. Code § 3509.5, subd. (b).) Accordingly, in reviewing PERB's findings, we do not reweigh the evidence. (*Boling*, *supra*, at p. 912.) Nor are we concerned " ' "that contrary findings may seem to us equally reasonable, or even more so." ' " (*Ibid*.) "Moreover, it is settled that when conflicting inferences may be drawn from undisputed facts, the reviewing court must accept the inference drawn by the trier of fact so long as it is reasonable." (*Id*. at p. 913.)

## II. PERB Properly Determined the Authority Imposed a Newly Created Policy, or Applied or Enforced an Existing Policy in a New Way, in Asserting That it Could Categorically Reject Group, Class, or Consolidated Grievances

" 'The centerpiece of the MMBA is section 3505, which requires the governing body of a local public agency, or its designated representative, to "meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of … recognized employee organizations." ' " (*Bolin*, *supra*, 5 Cal.5th at p. 913.) " 'The duty to meet and confer in good faith has been construed as a duty to bargain with the objective of reaching binding agreements between agencies and employee organizations…. *The duty to bargain requires the public agency to refrain from making unilateral changes* in employees' wages and working conditions until the employer and employee association have bargained to impasse." (*Id*. at p. 914, italics added.) "Section 3505 describes the duty as an obligation 'personally to meet and confer promptly upon request by either party,' " which language has been interpreted "to require that employers provide employee representatives with reasonable advance notice and an opportunity to bargain *before* reaching a firm decision to establish or change a policy within the scope of the representation." (*Id*. at p. 918, fn. 9.) " 'The duty to meet and confer in good faith is limited to matters within the "scope of representation."… Even if

---

[12] " '[A] determination is one of ultimate fact if it can be reached by logical reasoning from the evidence, but one of law if it can be reached only by the application of legal principles.' " (*Boling*, *supra*, 5 Cal.5th at p. 912, fn. 5.)

the parties meet and confer, they are not required to reach an agreement because the employer has "the ultimate power to refuse to agree on any particular issue. [Citation.] [Citation.] However, good faith under section 3505 "requires a genuine desire to reach agreement." ' " (*Id*. at p. 914.)

Here, the Board considered whether the Authority violated its bargaining obligations under the MMBA in asserting a categorical right to refuse to process group, class, and consolidated grievances, and thereby creating a new policy, or enforcing or applying an existing policy in a new way, that effected a unilateral change to the status quo (without affording SEIU notice and an opportunity to bargain).

"To establish a prima facie case that a respondent employer made an unlawful unilateral change, a charging party union that exclusively represents a bargaining unit must prove: (1) the employer changed or deviated from the status quo; (2) the change or deviation concerned a matter within the scope of representation; (3) the change or deviation had a generalized effect or continuing impact on represented employees' terms or conditions of employment; and (4) the employer reached its decision without first providing adequate advance notice of the proposed change to the union and bargaining in good faith over the decision, at the union's request, until the parties reached an agreement or a lawful impasse." (*Bellflower Unified School District* (2021) PERB Decision No. 2796, p. 9 (*Bellflower*).) Here, there was no dispute that elements (2), (3), and (4) were established; rather, the Authority challenged element (1), asserting SEIU could not show the Authority had changed or deviated from the status quo.

"There are three primary means of establishing that an employer changed or deviated from the status quo. Specifically, a charging party satisfies this element by showing any of the following: (1) deviation from a written agreement or written policy; (2) a change in established past practice; or (3) a newly created policy or application or enforcement of existing policy in a new way." (*Bellflower*, *supra*, PERB Decision No. 2796 at p. 10.)

19.

The Board determined the Authority changed or deviated from the status quo by imposing a newly created policy or applying or enforcing an existing policy in a new way, when it announced it had a categorical right to refuse to process group, class, or consolidated grievances. The Board held the Authority's assertion counted as a change from the status quo because it could affect future cases. The Board concluded, in light of its determination that SEIU had established a change to or deviation from the status quo, that the Union had further established its prima facie case that the Authority made the change unilaterally, without affording SEIU notice and an opportunity to bargain, thereby violating its bargaining obligations under the MMBA. (See *Sacramento City Unified School District* (2020) PERB Decision No. 2749, pp. 8-9 [employer engaged in unilateral change by refusing to allow arbitrator to decide arbitrability dispute and was entirely silent on when and to what extent it might follow the same interpretation in the future].) We detect no error in the Board's determination.

### A.     *The MOU's Consolidation Provision is at Best Ambiguous on Question of Requirement of Mutual Consent for Consolidation of Grievances*

The Board noted in its decision that there were "multiple factual and legal reasons that the Authority's position was a new one." First, as part of considering whether the Authority imposed a newly created policy, or applied or enforced an existing policy in a new way, the Board scrutinized the grievance consolidation provision contained in the parties' current MOU, finding the provision "is ambiguous on the questions at issue." The Board stated: "The Authority argues that Article VIII, Section E.7, which provides that '[g]rievances of an identical nature concerning the same subject matter may be consolidated,' indicates that both parties must agree to consolidate grievances and therefore grants the Authority the right veto any group or class grievance by simply withholding its consent to consolidation." The Board explained: "However, Section E.7 makes no reference to mutual agreement and can just as reasonably be interpreted as providing SEIU with a right to consolidate identical grievances, with or without the

20.

Authority's consent."  The Board cited *Deaton Truck Line, Inc. v. Local Union 612, etc.* (5th Cir. 1962) 314 F.2d 418, 421, 422 [rejecting identical "may" argument, and holding that where grievance procedure used the word "may" in the phrase "the dispute may be submitted" to arbitration, the phrase provided each party with the right to require the other to arbitrate].)  The Board concluded the ambiguity inherent in Article VIII, Section E.7 "constitutes one independent basis for finding the Authority unilaterally instituted a new policy."  We agree.

### B.     MOU's Definition of Grievance as a "Complaint by an Employee" is Not Determinative in a Literal Sense

In its Statement of Exceptions, the Authority had also argued that the MOU's definition of a grievance as "a complaint by an employee" and consistent use of "the singular 'an employee' and 'the employee,' rather than the plural," meant the MOU contemplated that only individual employees could bring grievances and implicitly disallowed group and class grievances.  Relying on *Omnitrans* (2009) PERB Decision No. 2010-M (adopting proposed decision) (*Omnitrans I*) and *Chula Vista City School District* (1990) PERB Decision No. 834, p. 22 (*Chula Vista*), the Board rejected this argument.

In *Omnitrans I*, the employer, based on language in the MOU referring to "the employee" pursuing a grievance (with or without a union representative), refused to process grievances filed by the union in its own name, leading the union to file an unfair practice charge under the MMBA.  (*Omnitrans I*, *supra*, PERB Decision No. 2010-M, adopting proposed decision at pp. 1-3.)  *Omnitrans I* first noted that PERB held in *Chula Vista*, *supra*, PERB Decision No. 834, that "under the Educational Employment Relations Act (EERA) an exclusive representative has a basic statutory right to file

21.

grievances in its own name."[13] (*Omnitrans I*, adopting proposed decision at p. 4, fns. omitted.) *Omnitrans I* explained that, under *Chula Vista*, a union's right to file grievances on a collective basis is rooted in the right of employees to act " 'collectively through a chosen representative to bargain with their employer about matters within the scope of representation,' " and to enforce the resulting " 'negotiated agreement' " using " 'the contractual tool' " of the grievance procedure. (*Omnitrans I*, adopting proposed decision at p. 5, quoting *Chula Vista*, *supra*, PERB Decision No. 834.) *Omnitrans I* stated: "This analysis appears equally applicable to the system of labor relations created by MMBA." (*Omnitrans I*, adopting proposed decision at p. 5.)

*Omnitrans I* next determined, with respect to the dispute therein: "It is true that the various steps of the grievance procedure in the MOU generally refer to the grievant as 'the employee,' with or without a Union representative. As a description, this may generally be accurate: in many cases the grievant will be an individual employee, with or without a Union representative. [We] do not, however, find this language to be a clear and unmistakable prescription that an individual employee must be the grievant, or a clear and unmistakable proscription that the Union itself may not be the grievant." (*Omnitrans I*, *supra*, PERB Decision No. 2010M, adopting proposed decision at p. 7.)

Here, the Board applied *Omnitrans I*'s analysis. The Board stated: "[W]e reject the Authority's argument that the MOU implicitly disallows group and class grievances by defining a grievance as a 'complaint by an employee' and using other similar singular phrasing.… *Omnitrans* (2009) PERB Decision No. 2010-M (*Omnitrans I*) and related cases hold that only clear and unambiguous[14] MOU language can bar a union from

---

[13]  EERA is codified at Government Code section 3540 et seq. It governs collective bargaining among employees and employers in California's public K-12 schools and community colleges.

[14]  The Board clarified: "Under PERB precedent, 'clear and unmistakable' has the same meaning as 'clear and unambiguous.' (*County of Merced* (2020) PERB Decision No. 2740-M, p. 10, fn. 7 (*Merced*).)"

22.

pursuing collective relief through a grievance, and an MOU does not satisfy that standard where it merely defines the grievant as a singular 'employee' and does not explicitly exclude group and class grievances.  (*Id*., adopting proposed decision at p. 5; *Chula Vista City School District* (1990) PERB Decision No. 834, p. 22 (*Chula Vista*) [because employees have statutory right to act collectively through their chosen representative, unions have statutory right to challenge contractual violations on a collective basis].)"

Thus, the Board rejected the Authority's argument, based on the MOU's use of singular terms such as "an employee" and "the employee" and its definition of a grievance as a "complaint by an employee," that the MOU encompassed only grievances filed by *individual employees* (that could only be consolidated pursuant to the Authority's unilateral discretion) and implicitly disallowed or excluded group and class grievances. The Board reasoned, based on *Omnitrans I* and *Chula Vista* and the discussion of unions' representational rights therein, that references to "an employee" and "the employee" in the MOU and the MOU's definition of a grievance as "a complaint by an employee," at a minimum did not necessarily restrict the Union's statutory right to initiate collective grievances in its own name (on its own behalf or on behalf of named and/or unnamed employees).

Stated differently, the Board essentially determined that the MOU's definition of a grievance as "a complaint filed by an employee" was at best ambiguous as to whether it encompassed collective grievances brought by the Union, that is, grievances brought by the Union on its own behalf and, by extension, grievances brought by the Union on behalf of named and/or unnamed employees.  (See, e.g., *Mt. Diablo Unified School District* (1990) PERB Decision No. 844E, adopting proposed decision at pp. 2, 5-7, 9-10, 18-19 (*Mt. Diablo*) [in the collective bargaining system contemplated by the EERA, the union's right to represent encompasses the right to file grievances alleging MOU violations, on behalf of the union or on behalf of named and/or unnamed bargaining unit

23.

employees, with or without the consent of the affected employees].)[15]  The Board indicated that this ambiguity in the MOU defeated the Authority's argument that the MOU literally restricted grievances to those brought by individual employees and implicitly disallowed or excluded group or class grievances, including grievances brought by multiple employees.

In addition, the Board emphasized, "The Authority's position is also untenable because it has failed to consistently express what differences (if any) it sees between group, class, and consolidated grievances."  The Board indicated it was necessary to address all types of collective grievances because the Authority's assertion, in January 2020, that "the parties' MOU granted it the right to reject group, class, or consolidated grievances on purely procedural grounds," was made in a context where ostensible distinctions between these terms were blurred.  It bears mention that Renita Nunn testified at the administrative hearing that the Authority's position that it could categorically reject collective grievances applied, without distinction, to collective grievances brought by employees as well as by the Union.  Although the Authority now claims it did not dispute the Union's statutory right to file collective grievances in its own name, the record suggests otherwise.  Regardless, the Board's reasoning was sound.

---

[15]  In *Mt. Diablo*, in interpreting the EERA, PERB stated:  "The statute envisions employees acting collectively through a chosen exclusive representative to bargain with their employer about wages, hours and other term and conditions of employment.  The grievance procedure is the contractual tool for enforcing the results of the negotiated bargain.  For contract violations to be grievable and arbitrable only at the instigation of an individual employee, runs counter to the very idea of collective action." (*Mt. Diablo*, *supra*, PERB Decision No. 844, adopting proposed decision at pp. 18-19, fn. omitted.)

*Mt. Diablo* added:  "An employer violation of a contract, even if it directly affects only one employee, has the potential of initiating a practice detrimental to the entire bargaining unit.  In a system of collective bargaining, the ability to challenge contractual violations must lie with the party that negotiated the agreement, i.e., the union.  Any other system makes the viability of the contract dependent upon the willingness of each unit member to stand individually." (*Mt. Diablo*, *supra*, PERB Decision No. 844, adopting proposed decision at p. 19.)

## C. The Import of Other Contractual Provisions

In rejecting the Authority's position that the references to the singular term "employee" in the grievance procedure in the MOU meant the MOU implicitly excluded group and class grievances, the Board also took note of other provisions of the MOU. Specifically, the Board pointed to Article VIII, Section C.6, which bars SEIU from using the grievance procedure for impasse resolution with regard to the terms of a proposed MOU. In a system of collective bargaining, the impasse resolution process is available only to the union or exclusive representative, not the public employee, because impasse resolution is part of the exclusive representative's bargaining obligations. (See *Relyea v. Ventura County Fire Protection Dist*. (1992) 2 Cal.App.4th 875, 878-879 [public employees do not have an individual right to bargain].) The Board noted: "[T]he Authority's position violates fundamental principles of contract interpretation by rendering superfluous Article VIII, Section C.6, which bars SEIU from using the grievance procedure for impasse resolution. This provision would be unnecessary if SEIU were already subject to a broader exclusion by virtue of being an employee organization rather than an 'employee.' " (See Civ. Code, § 3541 ["An interpretation which gives effect is preferred to one which makes void."].)

## D. The Import of the Parties' Past Conduct

The Board also considered the parties' past conduct.[16] The Board described the Kane, Venegas, Lerdo, and Halsell grievances, and noted that "[i]n *only one* of these four cases[, namely the 2018 Lerdo grievance,] does the record reflect that the County or the Authority addressed SEIU's ability to pursue a group, class, or consolidated

---

[16] In this context, the Board noted: "When considering the meaning of ambiguous contract language … we consider past practice as one interpretive tool even absent a practice that is 'regular and consistent' or 'historic and accepted.' (*Merced*, supra, PERB Decision No. 2740-M, p. 13, fn. 9.)"

grievance."[17]  (Italics added.)  The Board added:  "Specifically, in responding to the Lerdo grievance, Authority Vice President of Human Resources Lisa Hockersmith wrote SEIU as follows:  'Although the Memorandum of Understanding (MOU) does not expressly authorize the filing of group grievances, we recognize that it does allow grievances alleging similar facts to be consolidated.  Accordingly, we are treating this "group" grievance as SEIU's request to consolidate what would otherwise be individually filed grievances.' "  The Board determined that even in this solitary instance, Hockersmith's response "did not assert a categorical right to reject group, class, or consolidated grievances."

In sum, in interpreting the MOU's grievance provisions (by considering the consolidation provision, the definition of "grievance," the use of singular terms such as "an employee" and "the employee" in the text of the grievance procedure, the exclusion of the use of grievances for impasse resolution, and the parties' past conduct), the Board made a narrow determination to the effect that "the MOU was ambiguous and there was no clear rule or policy prior to January 2020, meaning that [as of that date] the Authority implemented a new rule, or enforced or applied an existing rule in a new way," in asserting that it could categorically and unilaterally reject group, class, and consolidated grievances.  Given its narrow focus, the Board refrained from resolving the question

---

[17]  The ALJ found the Authority was the legal successor to the County and, to the extent some of these grievances arose when KMC was owned and operated by the County, the County's conduct was properly imputable to the Authority.  The Authority did not take exception to the ALJ's finding that it was the legal successor to the County.  The successorship finding was therefore not before the Board or part of its decision.  Parties must exhaust, at each level of the administrative process, the issues and arguments they want to pursue further.  To the extent a party fails to do so with respect to one or more arguments, it waives judicial consideration of those arguments.  (*Carian v. Agricultural Labor Relations Bd*. (1984) 36 Cal.3d 654, 668, fn. 6.)  Accordingly, we decline to credit the Authority's claim that it has "received just two grievances that involved more than one employee."  The Board's determination that the handling of the Kane, Venegas, Lerdo, and Halsell grievances is imputable to the Authority stands.

"whether the MOU allows SEIU to file a group or class grievance, or to consolidate identical grievances over the Authority's objection."[18] We detect no error in the Board's determination.

**III.** **The Board Properly Found the Authority did not Establish that SEIU had Waived its Right to Bargain Over New Policies, or New Interpretations of Existing Policies, on Group, Class, and Consolidated Grievances, or that it had Waived Any Substantive Right to Adjudicating Collective Grievances**

*A.* *The Authority Did Not Establish that SEIU had Waived the Right to Bargain*

As discussed above, the Board determined that the MOU was ambiguous on the points at issue here, and therefore the Authority created a new policy or applied or enforced an existing policy in a new way, in asserting in January 2020, that it could categorically reject group, class, and consolidated grievances. In addition to making this determination, the Board also analyzed whether the Authority had shown SEIU had waived either its procedural right to bargain a change to the applicable grievance procedure, or any applicable substantive statutory right to file collective grievances. Since the Authority had raised waiver as an affirmative defense in its answer to the underlying administrative complaint, the Board properly considered these issues.

An employer may lawfully take unilateral action on a matter within the scope of representation if it can establish that the representative waived its right to meet and confer over the issue. (*City of Culver City* (2020) PERB Decision No. 2731-M (*Culver City*), p. 13, adopting proposed decision at p. 23.) Waiver of the right to meet and confer is an

---

[18] Specifically, the Board stated: "We need not resolve whether the MOU allows SEIU to file a group or class grievance, or to consolidate identical grievances over the Authority's objection, because … neither party has asked us to consider whether the Authority unilaterally deviated from the MOU. Rather, the most we determine is that the MOU was ambiguous and there was no clear rule or policy prior to January 2020, meaning that the Authority implemented a new rule, or enforced or applied an existing rule in a new way."

affirmative defense that may be established only by: (1) "clear and unmistakable" language in the parties' collective bargaining agreement; or (2) demonstrable conduct or past practice showing that the waiving party knowingly and voluntarily yielded its interest in the matter. (*City & County of San Francisco* (2017) PERB Dec. No. 2388-aM, p. 37; *City of Palo Alto* (2017) PERB Decision No. 2388-aM, p. 37.) Any doubts must be resolved against finding waiver. (*County of Merced* (2020) PERB Decision No. 2740-M, p. 10 (*Merced*).)

Here, the Board explained that the grievance and arbitration provisions of Article VIII of the MOU, taken collectively, were ambiguous with respect to the status of group, class, and consolidated grievances. Therefore, the Authority's reliance on these provisions to suggest that SEIU—by agreeing to a very limited grievance procedure, i.e., that grievances could only be filed by individual employees and consolidated subject to the Authority's unilateral discretion—had waived its right to bargain regarding the scope of Article VIII as to collective grievances, was unavailing. The Board concluded the Authority had not shown the Union had contractually waived its right to bargain in this regard.

The Board further found that the Authority had also failed to establish that SEIU had waived its bargaining rights by its conduct, specifically by inaction. The Board observed: To prove waiver by inaction, it is necessary to prove "conscious abandonment" of the right to bargain. (*Culver City*, *supra*, PERB Decision No. 2731-M, p. 18.) Showing that a union abandoned its right to bargain typically involves proof that "the union had 'clear notice,' meaning *advance knowledge*, of the employer's intent to change policy with sufficient time to allow a reasonable opportunity to bargain about the change and then failed to request negotiations." (*Id*., adopting proposed decision at pp. 25-26.) The Board rejected the Authority's argument that Hockersmith's response in 2018 to the Lerdo grievance triggered an obligation, on SEIU's part, to demand

28.

bargaining over the scope of Article VIII with respect to collective grievances, and in failing to make the demand, SEIU waived its right to bargain by inaction.

More specifically, the Board stated: "The Authority argues that SEIU waived its right to bargain by not demanding bargaining after Hockersmith responded to the Lerdo grievance in 2018. Before assessing this argument, we briefly explain how it fits with the related statute of limitations issue discussed *ante*. If Hockersmith's grievance response had announced a new policy, that would have triggered the statute of limitations on filing a unilateral change charge. But even in that hypothetical case, announcing a new policy as a fait accompli would not trigger a duty to demand bargaining and cannot support a waiver defense. (*Merced*, *supra*, PERB Decision No. 2740-M, p. 20.) Thus, waiver and timeliness normally apply in separate circumstances: announcing a fait accompli can trigger the statute of limitations for a unilateral change charge but cannot support a waiver by inaction defense, while *proposing* a new policy does not trigger the statute of limitations but can lead PERB to find waiver by inaction if the union does not respond to the proposal within a reasonable time." The Board concluded: "[T]he Authority does not and cannot contend that Hockersmith *proposed* a new policy in her 2018 grievance response, meaning that SEIU had no obligation to demand to bargain and its failure to make such a demand thus did not waive any bargaining rights." We detect no error in the court's determination.

### B. The Authority Did Not Establish that SEIU had Waived its Substantive Statutory Right to Adjudicate Collective Grievances

A contractual provision or procedure may also waive certain statutory rights, including SEIU's statutory right to adjudicate collective grievances. Again, the asserted waiver must be evidenced by clear and unmistakable contract language or demonstrable conduct indicating that the union knowingly and voluntarily relinquished its interest in the matter. (*Culver City*, *supra*, PERB Decision No. 2731-M, p. 13; *Metropolitan Water District of Southern California* (2009) PERB Decision No. 2055-M, p. 5; *Stockton Police*

*Officers' Assn. v. City of Stockton* (1988) 206 Cal.App.3d 62, 66.)  The Board determined the Authority had not shown that, under the MOU, SEIU had waived its statutory right to pursue contractual violations on a collective basis.

The Board explained:

> "The MMBA mirrors the EERA in providing unions with a 'right to represent':  'Recognized employee organizations shall have the right to represent their members in their employment relations with public agencies.'  (MMBA, § 3503.)  In *Omnitrans I*, *supra*, PERB Decision No. 2010-M, we found that the MMBA, like EERA, provides an exclusive representative with a statutory right to file union grievances seeking relief on a collective basis.  (*Id*., adopting proposed decision at p. 5.)  Any waiver of this union right must be clear and unmistakable.  (*Ibid*.)

> "The Authority argues that Article VIII limits the grievance procedure to single employee grievances, except where the parties mutually agree to consolidate identical grievances.  But as already noted, Article VIII is far from clear and unmistakable on this point.  The article makes no mention of group or class grievances, and it can reasonably be construed to mean that SEIU has the right to consolidate identical grievances, with or without the Authority's consent.  [Citation.]  Evidence concerning past group, class, and consolidated grievances, including the Lerdo grievance and the Authority's response thereto, similarly undercut the argument that Article VIII is a clear and unmistakable waiver.  Moreover, while Article VIII defines a grievance as a complaint by 'an employee,' in *Omnitrans I*, *supra*, PERB Decision No. 2010-M, we held that a grievance procedure which repeatedly referred to the grievant as 'the employee' did not waive the union's statutory right to seek collective relief.  (*Id*., adopting proposed decision at pp. 3, 5, 7.)[19]

---

[19]  The Board added in a footnote, here:  "In *Omnitrans* (2010) PERB Decision No. 2143-M (*Omnitrans II*), we considered the same MOU language at issue in *Omnitrans I*, this time in the context of a unilateral change allegation.  The employer refused to process a grievance filed by the union's president alleging violations of several MOU articles, claiming among other things that the grievance procedure did not allow the union to file grievances in its own name and that the union president lacked standing to file a grievance because he was not himself an 'employee' as defined by the MOU.  (*Id*. at p. 7.)  We again found no clear and unmistakable waiver and therefore concluded that the employer unlawfully changed the status quo by refusing to process the union's grievance.  (*Id*. at pp. 7-8.)"

30.

"The Board has only once found partial waiver of a union's right to file certain types of grievances. In *Trustees of the California State University* (1995) PERB Decision No. 1094-H, the grievance procedure stated that a 'union grievance' was available only as to one contract article, and an arbitrator had interpreted that provision to disallow any other type of union grievance. [Citation.] Here, in contrast, the MOU does not explicitly mention group grievances, class grievances, or union grievances, and it allows consolidated grievances.

"Furthermore, reading Article VIII, Section B to mean that any grievance must be a complaint by an employee would leave SEIU with no ability to enforce union rights in the MOU. Such a result is typically not a fair interpretation of contractual intent, which is another reason that contractual language referring to the grievant as an employee does not waive a union's right to use the grievance procedure to pursue collective relief. (*Omnitrans II*, *supra*, PERB Decision No. 2143-M, p. 7.)

"Finally, the Authority's position violates fundamental principles of contract interpretation by rendering superfluous Article VIII, Section C.6, which bars SEIU from using the grievance procedure for impasse resolution. This provision would be unnecessary if SEIU were already subject to a broader exclusion by virtue of being an employee organization rather than an 'employee.'

"For these reasons, we reject the Authority's contractual waiver defense." (Fns. omitted.)

We conclude the Board properly relied on the MOU's language, the parties' past practice, binding PERB precedent, and settled contract interpretation principles to find the Authority did not establish that the MOU amounted to a waiver by the Union of its statutory right to file collective grievances.[20]

## IV. The Authority's Arguments are Unavailing

The Authority deploys several unavailing theories to attack the Board's determination that the Authority implemented an unlawful unilateral change to a matter

---

[20] The Board noted in a footnote: "When considering the meaning of ambiguous contract language—including if a respondent asserts an MOU-based defense—we consider past practice as one interpretive tool even absent a practice that is 'regular and consistent' or 'historic and accepted.' (*Merced*, *supra*, PERB Decision No. 2740-M, p. 13, fn. 9.)"

within the scope of representation, which change amounted to a per se violation of the duty to meet and confer. For the sake of clarity, we have addressed the Authority's arguments in a different order than the order reflected in the Authority's brief.

First, as previously discussed in the context of the Board's analysis, the Authority insists that Article VIII of the MOU defines a grievance as a complaint by an employee and uses singular terms such as "an employee" and "the employee" rather than the plural forms of these terms, whereby, under the MOU, grievances must necessarily be made by "a singular employee" and group and class grievances are implicitly disallowed. The Authority emphasizes that while the MOU does not address group and class grievances, it contains a consolidation provision to the effect that "[g]rievances of an identical nature concerning the same subject matter may be consolidated," under which provision consolidation requires mutual assent of the parties. In short, the Authority argues that, under the clear and unambiguous terms of the MOU, a grievance can only be filed by an individual employee and the Authority can categorically reject group, class, and consolidated grievances.[21]

---

[21] In this vein, the Authority also assails the ALJ's reference, in his proposed decision, to *Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 462-465 (*Minish*). The ALJ had noted that *Minish* rejected "restrictive statutory interpretation based on use of singular rather than plural or plural rather than singular." *Minish* was interpreting the singular term "employee" as used in a several statutes in the Labor Code. *Minish* stated: "The use of singular and plural terms in these statutes must be viewed in light of [Labor Code] section 13 which provides, "The singular number includes the plural, and the plural the singular." (*Minish* at p. 464.) The Authority argues the ALJ's citation to *Minish* was misplaced because, unlike *Minish*, here "[t]here is no language to suggest that the single use of terms like employee or grievance in the grievance procedures of the MOU was ever intended to include the plural as well." The Authority's argument regarding the inapplicability of *Minish* is irrelevant because the Board's analysis did not mention or rely on *Minish*. To the extent the Authority asserts its contentions regarding *Minish* are relevant because the Board adopted the ALJ's decision, this assertion is patently wrong. The Board affirmed the ALJ's proposed decision and summarized and supplemented the ALJ's analysis on the most critical points, but it did not adopt the proposed decision. (See *City of San Ramon* (2018) PERB Decision No.

32.

As discussed above, the Board rejected these contentions, instead finding that the contractual grievance procedure was ambiguous with respect to group, class, and consolidated grievances. We detect no error in the Board's determination. Accordingly, we reject the Authority's contention that "substantial evidence establishes that the parties agreed to a single-employee grievance process in the applicable memorandum of understanding and PERB's factual findings to the contrary are not supported by substantial evidence in the record." (See *Boling*, *supra*, 5 Cal.5th at p. 912 ["[i]f there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so"].)

Next the Authority argues the Board's reliance on *Omnitrans I*, *supra*, PERB Decision No. 2010-M, *Chula Vista*, *supra*, PERB Decision No. 834, *Omnitrans II*, *supra*, PERB Decision No. 2143-M, and *Mt. Diablo*, *supra*, PERB Decision No. 844E, is misplaced. The Authority argues that while these cases recognized a union's right to file grievances in its own name, the Board incorrectly interpreted them as establishing a "pre-existing statutory right to file group or class grievances."

The Authority mischaracterizes the Board's analysis. The Board cited these cases in rejecting the Authority's contention that the MOU only permitted grievances filed by individual employees and implicitly disallowed group and class grievances. The Board indicated that these cases establish that a union has a statutory right to initiate grievances on its own behalf and on behalf of named and/or unnamed employees in the bargaining unit and the MOU did not clearly and unmistakably reflect a waiver of this right by the Union. The Board found that, since the Authority had not shown SEIU had waived its statutory right to bring grievances seeking collective relief, the Authority could not establish the MOU *clearly and unambiguously* permitted only grievances directly

2571-M, p. 5 [the Board need not address alleged errors in ALJ's proposed decision that would not affect the outcome].)

33.

initiated by individual employees (because, at a minimum, under the MOU the union appeared to retain the right to submit grievances in its own name). The Board concluded that, contrary to the Authority's position, when the contract was interpreted in the context of, among other things, the union's statutory right to file grievances in its own name (on its own behalf and/or on behalf of employees), *the contractual language was at best ambiguous, as to the range of permitted types of grievances*.

By the same token, the Board determined that the ambiguity in the contractual language defeated the Authority's contention that the MOU implicitly *disallowed* group and class grievances. The Board also observed that the Authority's position—i.e., that the MOU implicitly disallowed group and class grievances—was undermined by the fact the Authority had not proffered discrete or distinct definitions for the terms group grievance, class grievance, and consolidated grievance, and further, had "failed to consistently express what differences (if any) it sees between group, class, and consolidated grievances."

In sum, the Board's analysis was restricted to interpreting the MOU, in light of the Union's statutory rights as well as other factors. Therefore, we reject the Authority's argument that the Board improperly interpreted *Omnitrans I*, *Chula Vista*, *Omnitrans II*, and *Mt. Diablo Unified School District*, to "support [an erroneous] proposition" that "there is some pre-existing statutory right to file group or class grievances."[22]

---

[22] The Authority also questions the validity of a particular aspect of the ALJ's proposed decision, despite the fact that the Board, upon review of the proposed decision, did not endorse this aspect thereof. Specifically, the Authority challenges the following passage in the ALJ's proposed decision: "In the absence of any persuasive argument or authority to the contrary, I conclude that the employee rights language of the MMBA, including the rights of employees to self-organization, to act in concert, and to be represented by an employee organization of their own choosing, includes a right to participate as a *group* in grievance and arbitration proceedings, unless the exclusive representative has agreed otherwise." The Authority contends the Board adopted the ALJ's proposed decision including this element thereof. However, as noted above, the Board did not adopt the ALJ's decision and therefore the Authority's contentions

34.

The Authority complains that PERB had no basis to consider the Union's statutory right to file grievances in its own name because "[t]he Authority's position has never been that SEIU waived its right to submit a grievance in its name," and asserts that in considering the Union's statutory rights, "PERB fail[ed] to address the actual issues before it." We disagree.

The Board considered the Union's statutory right to initiate grievances on its own behalf and on behalf of employees, in addressing the Authority's contention that the MOU contemplated that only an individual employee could file a grievance and permitted the Authority to categorically reject all group, class, and consolidated grievances. The Authority's position amounted to an assertion that the Union had waived its right to bring grievances in its own name, whether on behalf of itself or on behalf of employees. The Board also noted that the Authority had "failed to *consistently* express what differences (if any) it sees between group, class, and consolidated grievances"—union grievances should be added to the list—and highlighted the fact that the blurred distinctions "could affect future cases." (Italics added.)

Significantly, the Board's brief persuasively shows that the Union had a role in the four relevant grievances addressed at the administrative hearing: the 2015 Kane grievance states it was filed by "SEIU Local 521 on behalf of all affected bargaining units"; the 2016 Venegas grievance had an SEIU case number and was filed by "E. Venegas, [Shop] Steward, et al. affected employees"; the 2018 Lerdo grievance was submitted by SEIU Regional Director Stephen Cutty and was on SEIU letterhead; and the 2019 Halsell grievance was documented on an SEIU form and signed by Ronald Hanson, among others, and indicated that the demand at issue in the grievance was made by "SEIU Local 521" (the Authority's response to the Halsell grievance also indicated that

_____

regarding the disputed passage are unavailing. (See *City of San Ramon*, *supra*, PERB Decision No. 2571-M, p. 5 [the Board need not address alleged errors in ALJ's proposed decision that would not affect the outcome].)

SEIU was the party citing the violations at issue). Finally, at the administrative hearing, Renita Nunn, human resources director for the Authority, testified with respect to the Authority's position that the MOU did not afford an absolute right to file a collective grievance, that it made no difference whether such a grievance was submitted by a group of employees or by the Union on behalf of a group of employees. We conclude the Board did not err in considering the Union's statutory right to initiate grievances in its own name, whether on behalf of itself or on behalf of named or unnamed employees.

The Authority next argues that "since the grievance procedure in the MOU concludes in arbitration, PERB should have and this Court should consider cases addressing the contractual nature of this right." The Authority goes on to state: "The well settled law in the United States, including California, provides that if a contract does not allow or require a group or class-action grievance/arbitration, then a party should not be forced to agree to one." However, the Board specifically clarified: "We need not resolve whether the MOU allows SEIU to file a group or class grievance, or to consolidate identical grievances over the Authority's objection, because … neither party has asked us to consider whether the Authority unilaterally deviated from the MOU.[23] Rather, the most we determine is that the MOU was ambiguous and there was no clear rule or policy prior to January 2020, meaning that the Authority implemented a new rule, or enforced or applied an existing rule in a new way." Since the Board was not required to, and did not, definitively interpret the MOU, the Authority's contentions are misplaced.

---

[23] As explained in *Bellflower*, *supra*, PERB Decision No. 2796, "There are three primary means of establishing that an employer changed or deviated from the status quo. Specifically, a charging party satisfies this element by showing any of the following: (1) deviation from a written agreement or written policy; (2) a change in established past practice; or (3) a newly created policy or application or enforcement of existing policy in a new way." (*Bellflower*, *supra*, PERB Decision No. 2796 at p. 10.)

The Authority also cites *Lamps Plus, Inc. v. Varela* (2019) 139 S.Ct. 1407, 1415, stating it "held that an ambiguous agreement cannot provide the necessary contractual basis for compelling class arbitration under the Federal Arbitration Act." (Emphasis omitted.) However, the Authority's discussion of *Lamps Plus* encompasses only a few sentences and is *limited to describing its holding*. The Authority does not develop the argument further to explain why we should apply *Lamps Plus* in the instant case, which arises under the MMBA, a California statute. The Authority, on the contrary, concedes that "federal law … relat[ing] to interpretation of the Federal Arbitration Act" "may not be controlling over PERB or the MMBA." Given the Authority's barebones mention of *Lamps Plus*, its citation to it is unavailing.

Finally, the Authority argues the Board erred in requiring the Authority to show the Union had waived its statutory right to bargain any changes in policy regarding the processing of grievances and/or waived its statutory right to initiate grievances in its own name. We reject this contention. Indeed, the Authority had itself asserted waiver as an affirmative defense in its answer to the underlying administrative complaint. (See *Culver City*, PERB Decision No. 2731-M, p. 13 ["As waiver is an affirmative defense, the party asserting it bears the burden of proof."].)

The Board, after determining that the Authority had made a unilateral change to the status quo by changing the policy regarding processing of grievances, properly considered whether the Authority had established the Union had waived its statutory right to bargain because, had the Union done so, the Authority would be entitled to make unilateral changes in this regard. Further, since the Board's conclusion that the Authority had made a unilateral change hinged in part on analyzing the MOU in light of the Union's statutory right to initiate grievances in its own name, the Board properly considered whether the Authority had shown the Union had waived this statutory right, thereby rendering it inapplicable. Had the Authority established waiver on either of the

two aforementioned counts, the Authority's position would have been vindicated. The Board's analysis was correct and we reject the Authority's misplaced challenge thereto.

To the extent the Authority makes additional tangential or miscellaneous claims, we see no merit to them and need not address them further. We conclude the Board's determination that the Authority made a unilateral change in violation of the MMBA when it failed to bargain with SEIU prior to enforcing a categorical right to reject group, class, and consolidated grievances is not legally erroneous and is supported by substantial evidence in the record. Accordingly, we affirm the Board's decision and deny the Authority's petition for writ of extraordinary relief.

## DISPOSITION

Kern County Hospital Authority's petition for writ of extraordinary relief is denied. SEIU is awarded its costs on appeal.

SMITH, J.

WE CONCUR:


DETJEN, Acting P. J.


FRANSON, J.

38.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KERN COUNTY HOSPITAL AUTHORITY,<br><br>  Petitioner,<br><br>  v.<br><br>PUBLIC EMPLOYMENT RELATIONS BOARD,<br><br>  Respondent;<br><br>SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 521,<br><br>  Real Party in Interest. | F085586<br><br>(PERB Dec. No. 2847-M, Case No. LA-CE-1451-M)<br><br><br>**ORDER GRANTING REQUEST FOR PUBLICATION** |

The request for publication filed by Public Employment Relations Board on March 12, 2024, in the above entitled matter, is hereby granted. As the nonpublished opinion filed on February 26, 2024, meets the standards for publication specified in the California Rules of Court, rule 8.1105(c)(2), it is ordered that the opinion be certified for publication in the Official Reports.

With the granting of the Public Employment Relations Board's request, the request for publication filed by Service Employees International Union, Local 521, on March 12, 2024, is hereby denied as moot.

SMITH, J.

WE CONCUR:

DETJEN, Acting P. J.

FRANSON, J.

1.